**STATE of Iowa, Appellee,**

v.

**Donald Keith HORN, Appellant.**

**No. 62231.**

Supreme Court of Iowa.

Aug. 29, 1979.

Rehearing Denied Oct. 11, 1979.

David A. Hirsch, of Edward W. Dailey Law Office, P.C., Burlington, for appellant.

Thomas J. Miller, Atty. Gen., Ann Fitzgibbons and Richard L. Cleland, Asst. Attys. Gen., and Steven S. Hoth, County Atty., for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, REES, McCORMICK, and McGIVERIN, JJ.

McGIVERIN, Justice.

After jury trial, defendant Donald Keith Horn appeals his conviction of first degree murder in violation of sections 690.1–.2, The Code 1977. Defendant urges numerous assignments of error. We find merit in two of defendant's contentions and therefore reverse and remand.

On December 12, 1977, the body of Jerri Connelly was found in a sewer pit located in Burlington. He had been shot through the heart with a "good sized" copper jacketed bullet. In addition, the back part of his skull was fractured and the front left portion of his head was injured, resulting in exposure of brain matter. Five of the victim's ribs were fractured in the back.

Tim Conard was arrested at 11:30 p. m. on December 14, 1977, for the murder of Connelly. Defendant Horn was arrested on December 15 at 2:15 a. m., also for the murder of Connelly. Ernest Strickland was also arrested on charges relating to the murder.

On December 14 the residence of Ernest Strickland, which was also the residence of Tim Conard, was searched by police. The search produced a gun, among other items. In the early morning hours of December 15 police executed a search warrant at defendant's home.

Prior to defendant's trial, Conard pleaded guilty to an open charge of murder for killing Connelly. Conard was held in the county jail awaiting his degree of guilt hearing, which was to take place after defendant's trial for murder.

From the testimony at trial, the jury could have found the following facts. On December 7 Conard left the Strickland residence to visit Donald Horn. During the visit defendant offered to pay Conard three ounces of marijuana and a gun if he would kill Jerri Connelly for him. Conard accepted and Horn gave him the gun and one-half ounce of marijuana at that time. Conard returned to the Strickland residence and after a short time left to find Jerri Connelly. The victim was eventually found at his residence. Conard and Connelly then walked to a nearby sewer pit. While in the sewer pit, Conard pulled the gun on Connelly and shot him through the heart. Conard then left the sewer pit and returned to the Strickland residence. After a short time, Conard left the Strickland residence and went to defendant's home and informed Horn that he had killed Connelly. Horn then gave Conard the remaining two and one-half ounces of marijuana to complete the payment. Conard returned to Strickland's residence and turned the gun over to Ernest Strickland.

Defendant raises seventeen issues which we discuss in divisions one through thirteen. Our fourteenth division relates to printing costs.

*I. Should defendant have received copies of the Conard and Strickland statements?* Prior to trial, Horn moved for production of copies of all existing statements of Ernest Strickland and Timothy Conard in the possession and control of the State. After hearing, the court denied defendant's motion.

Later, after deposition of Strickland at which he refused to answer certain questions, claiming his fifth amendment privilege, defendant again requested the statement of Strickland taken by the Burlington Police Department. Strickland made one statement under oath on December 14, 1977. The statement was in question and answer form. It was taken down and transcribed by a person who was a certified shorthand reporter and notary public. The statement was certified by the reporter as being accurate and as given under oath. The statement was not signed by Strickland. The court again denied defendant's request.

At trial the State called Strickland as a witness. Defendant began his cross-examination of Strickland and, between his morning and afternoon testimony, the court examined Strickland's statement in its entirety. In the presence of both counsel, the court stated that it found nothing in the statement that was either inconsistent with Strickland's testimony or exculpatory as to defendant. Defense counsel made no objection to this procedure, nor did he request a copy of Strickland's statement at any time during cross-examination or thereafter.

At a later point during the trial, the State called Conard as a witness. At the end of the direct examination, defendant requested actual copies of each statement that Conard had given to the police. In the presence of both counsel, the court held an in-camera inspection of the two statements. One was a very short report by Detective Smith, which related to his interview of Conard on December 12, 1977. According to the report, Conard denied any knowledge as to how Jerri Connelly's life was taken. The report was Detective Smith's summary of the statements made by Conard. Counsel for defendant was so advised. The second statement was in question and answer form, recorded by a stenographer in shorthand and signed by Conard. The statement was concluded at 2:10 a. m. and signed at 3:49 a. m. on December 15, 1977. The court, having examined this statement in-camera, informed counsel for both parties in chambers that there were two inconsistencies between the statement and Conard's direct testimony. The court then read the questions and answers from the statement that it believed to be inconsistent. Defendant was not given a copy of any part of Detective Smith's report or Conard's statement.

On appeal, defendant argues that it was error to deny him a copy of both Strickland's and Conard's statements, and that it was not sufficient for the court to merely search the statements for inconsistencies and exculpatory evidence and read what it found to be inconsistencies in the statements.

In *State v. White,* 260 Iowa 1000, 1006–1007, 151 N.W.2d 552, 555 (1967), we approved the procedures of the *Jencks Act,* 18 U.S.C. § 3500, as it relates to making tapes of police radio calls available to defendant for appropriate use. In numerous cases since that time we have approved the *Jencks* procedure. *E. g., State v. Cuevas,* 282 N.W.2d 74, 82 (Iowa 1979) (grand jury testimony of witness); *State v. Gartin,* 271 N.W.2d 902, 911 (Iowa 1978) (grand jury testimony of witness); *State v. Hall,* 235 N.W.2d 702, 713–15 (Iowa 1975) (copies of physical evidence and grand jury testimony of witness); *State v. Deanda,* 218 N.W.2d 649, 651–52 (Iowa 1974) (copies of police reports of testifying officer); *State v. Cunha,* 193 N.W.2d 106, 111 (Iowa 1971) (statements of trial witnesses); *State v. Mayhew,* 170 N.W.2d 608, 613–14 (Iowa 1969) (copies of police reports of testifying officer); *State v. Eads,* 166 N.W.2d 766, 771–75 (Iowa 1969) (physical evidence, scientific reports setting forth information obtained from that evidence, statements made to police by trial witnesses and copies of police investigatory reports).

In order for statements to be subject to the *Jencks Act* procedures, which we have approved, it is necessary that they be written statements made by the witness and signed, or otherwise adopted or approved by the witness, or that they be a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement. The distinction between a statement made by a witness and one that is an imprecise summary of what another understood the witness to say has been made on the federal level as well as in Iowa. *See Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *State v. Houston,* 209 N.W.2d 42, 46 (Iowa 1973); *State v. Schlater,* 170 N.W.2d 601, 607 (Iowa 1969).

We quoted the following language from *Palermo v. United States,* 360 U.S. 343, 350–53, 79 S.Ct. 1217, 1223–25, 3 L.Ed.2d 1287, 1294–96 (1959), with approval in *State v. Schlater,* 170 N.W.2d 601, 607 (Iowa 1969):

"One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of Jencks would compel the undiscriminating production of agent's summaries or interviews regardless of their character or completeness * * * [I]t was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations * * *.

* * * * * *

* * * It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. * * It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements made by the witness recorded verbatim, or nearly so * * *,' see Appendix B, post 79 S.Ct. page 1228, that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. * * * Since we feel the statutory standard has guiding definiteness, it would be idle to attempt a minute enumeration of particular situations to which it is to be applied. * * *, Final decision as to production must rest, as it does so very often in procedural and

evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined, and subject to the appropriately limited review of appellate courts."

■ It is clear that the court considered Strickland's statement and Conard's signed statement as statements falling within the requirements of the *Jencks* procedure. We agree.

However, Detective Smith's report, which was not adopted by Conard, does not fall under the *Jencks* procedure. No error attended the refusal of the court to order production of that report.

We have yet to allow defendants to have copies of statements of witnesses before trial. *State v. Aossey,* 201 N.W.2d 731 (Iowa 1972); *State v. Niccum,* 190 N.W.2d 815 (Iowa 1971); *State v. Eads,* 166 N.W.2d 766, 773–74 (Iowa 1969). The *Jencks* procedure "does not afford defendant license to rummage through prosecution files before trial, but was intended to protect files from unwarranted disclosure and to only make available at trial those materials which might lead to impeachment." *State v. Galloway,* 167 N.W.2d 89, 92 (Iowa 1969).

In *State v. Eads,* 166 N.W.2d 766, 774 (Iowa 1969), we held that the trial court abused its discretion in ordering the State to deliver copies of the statements of all witnesses expected to testify at defendant's trial. We went on to say that:

We do not foreclose the possibility that a defendant may be entitled to a particular statement upon showing it is necessary to his proper defense. . . . However, . . . this must be more than "a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime."

*Id.* at 774 (citations omitted).

Defendant made no showing of such a necessity in his request for Conard's and Strickland's statements on March 28, 1978, prior to trial. It cannot be said the trial court erred in denying such request at the pretrial stage. In addition, defendant failed to show any necessity for the production of Strickland's statement in his request on May 2, 1978, prior to trial. Strickland's refusal to answer defendant's questions during deposition does not per se create a necessity to have his statement turned over to defendant for his proper defense.

Defendant did not request to examine Strickland's statement after his direct testimony, but defendant did request a copy of Conard's statement after Conard's direct testimony and before his cross-examination. The trial court purported to follow the in-camera inspection procedure approved in *State v. Mayhew,* 170 N.W.2d 608, 614 (Iowa 1969). The court examined Conard's statement for inconsistencies with his direct testimony and for exculpatory evidence. The court then read to both counsel the statements he believed were inconsistent with Conard's direct testimony.

We said in *State v. Deanda,* 218 N.W.2d 649, 651–52 (Iowa 1974), when discussing the scope of defendant's right to such statements for impeachment purposes:

Issue is also joined as to the precise extent of the materials to be shown defense counsel. Defendant believes availability extends to all matters *germane* to the subject matter of the testimony of the witness. The State believes availability is limited to those materials which might be *inconsistent* with the witness's testimony. *State v. White,* [260 Iowa 1000, 151 N.W.2d 552] supra; *State v. Mayhew,* 170 N.W.2d 608 (Iowa 1969); *State v. Mayhew,* (second case), 183 N.W.2d 723 (Iowa 1971); *State v. Houston,* 209 N.W.2d 42 (Iowa 1973). We do not believe any of these holdings have limited the scope of availability of such materials. In some cases defendant's counsel sought only inconsistent materials. We hold the trial court should make available to defendant's counsel anything germane to the trial. Availability should not be limited to those matters thought to be inconsistent with the witness's testimony.

We believe the materials sought in this case were *germane to the subject matter* of the testimony of the witness. They

should not have been withheld because they were thought not to be inconsistent with the witness's testimony.

■ In light of *State v. Deanda*, we have examined the statement of Conard and hold that it was germane to the subject matter of Conard's direct testimony in more aspects than the limited number of inconsistencies found by the trial court. That is not to say that the trial court necessarily committed reversible error.

In *State v. Henderson*, 272 N.W.2d 492, 494 (Iowa 1978) we said that:

[A] defendant and his counsel are ordinarily the ones to say whether given material is useful to the defense. *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 n. 21; cf. *Campbell v. United States*, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 n. 14. But if a defendant could assert this principle although the record demonstrates the ruling was utterly without prejudice to him, he could repeal another principle that error which does not cause harm does not bring about a reversal. The later principle is, however, viable in Jencks' situations when supported by the record.

(citations omitted).

In *Henderson* we examined the record and found that the defense had been apprised of everything that the report would have told them. We held that no harm was suffered by defendant as a result of the trial court's refusal to provide defendant with a copy of the report.

In the present case, however, after an examination of the record we cannot say defendant was apprised of everything contained in Conard's statement that was germane to his direct examination. Not only were there additional germane assertions made by Conard in his statement to the police, there were also a number of material inconsistencies between the statement and his direct testimony. The following are two such instances. Conard said in his statement that he made the contract with Horn on December 6, 1977, and not on December 7, as he testified at trial. Also, in his statement he said he was not to keep the

gun as part of his payment for the murder, but was supposed to give it to Strickland. This is contrary to his testimony at trial. Defendant had no way of knowing of these matters and was thereby limited in his efforts to impeach the testimony of Conard at trial. This situation could have been avoided if the court had given a copy of Conard's statement to defendant before Conard's cross-examination, as all of Conard's statement appears to us to be germane to his direct testimony. We have no alternative but to hold that the court's error in refusing to provide defendant with a copy of the germane matter in Conard's signed statement, after Conard's direct testimony, constituted prejudicial error.

We reverse on this ground for a new trial.

II. *Did the court properly permit Strickland's testimony over defendant's hearsay objections?* Defendant claims error because the court overruled his hearsay objections to the following two portions of Ernest Strickland's direct testimony:

Q. Did Tim [Conard] ever tell you what threats that, if any, that Donnie [Horn] had made against him if he didn't do the killing?

MR. HIRSCH: Objected to as calling for hearsay and leading and suggestive.

THE COURT: Overruled. The witness may answer if he knows.

A. It was at a later date within the Des Moines County Jail. Yes, sir, he did.

Q. And what specifically were those threats?

MR. HIRSCH: Objected to as calling for hearsay.

Q. That the defendant made?

THE COURT: Overruled, you may answer.

A. I was told by Tim that Donnie told him he would die within twenty-four hours if he did not pull the trigger on Jerri Connelly.

Q. Okay. While you were either in the same cell or adjoining cells in the Des

Moines County Jail, what did Tim Conard tell you or relate to you about the case?

MR. HIRSCH: Same objection [hearsay].

THE COURT: Overruled. You may answer.

A. He mentioned to me once that when he went over to Donnie's house the first time on December 7th, that Donnie had a written piece of paper signed, and he gave the first name of Bill. He told me he couldn't make out the last name, which was supposed to be a death contract which Tim Conard would die within twenty-four hours if he did not pull the trigger on Jerri Connelly.

■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *State v. Miller,* 204 N.W.2d 834, 840 (Iowa 1973).

The State contends that Conard's statement, testified to by Strickland, was not hearsay, in that it was not offered to prove the truth of the matter asserted but only to prove the fact that a statement was made by Horn to Conard. We have recognized that statements not offered for the truth of the matter asserted do not constitute hearsay and will not be excluded on such grounds. *See State v. Jones,* 271 N.W.2d 761, 767 (Iowa 1978).

■ In determining if these statements were hearsay we look to the purpose of the offered testimony. *State v. Jones,* 271 N.W.2d 761, 767 (Iowa 1978). As the State contends, Conard's statement, testified to by Strickland, was offered to show that the statement was made by defendant to Conard. The State was attempting to show that Conard killed Jerri Connelly at defendant's request and the statements tend to support that theory.

■ The record leaves no doubt that the State was offering Conard's statement, as testified to by Strickland, to show the truth of the fact that a statement was made by defendant to Conard, which Strickland did not hear. What Conard *said* —namely, that Horn told him he would die if he did not kill

Connelly—must be believed by the jury to be relevant to the case. It can therefore be said that the State was offering Conard's statement to show the truth of its substance.

We have here a classic case of hearsay, involving Strickland's testimony, but that is not to say that the same statement if made by Conard while testifying would be hearsay. At such time Conard would be purporting to relate an admission of defendant which by definition would not constitute hearsay. *State v. Kidd,* 239 N.W.2d 860, 864 (Iowa 1976).

The State also says that even if Strickland's testimony was hearsay, admitting the testimony was nonprejudicial error. The State cites *State v. Johnson,* 272 N.W.2d 480, 482–83 (Iowa 1978) for this proposition, and argues that because Conard testified to precisely the same facts as Strickland did in his hearsay testimony the admission of Strickland's testimony was not prejudicial.

■ The admission of hearsay evidence is presumed to be prejudicial error unless the contrary is affirmatively established. *Johnson,* 272 N.W.2d at 482; *State v. Menke,* 227 N.W.2d 184, 188 (Iowa 1975).

We said in *Johnson* that the hearsay "statement was harmless error in light of the multiplicity of other sources of information which duplicate [the] testimony." 272 N.W.2d at 483. In that case, however, eleven witnesses plus the defendant himself testified to substantially the same evidence that was deemed hearsay when testified to by another witness at trial.

■ The hearsay evidence in *Johnson* was extremely trustworthy in light of the multiplicity of the substantially same evidence introduced. The testimony by Strickland lacks the same degree of trustworthiness. Only Conard testified to the same evidence contained in Strickland's hearsay statements. Strickland was in jail on charges relating to the murder for which defendant was being tried. Conard had pleaded guilty to an open charge of murder for the same murder with which defendant was charged. Conard's degree of guilt

hearing was to be held after defendant's trial. Both Strickland and Conard had made bargains with the County Attorney in exchange for their testimony at defendant's trial.

We hold that Strickland's above-quoted testimony was hearsay and that its admission at trial constituted prejudicial error.

*III. Should defendant's motion for disclosure of an informant's identity have been granted?* The problem here arose during the deposition of Officer Jay Holley on March 16, 1978. Holley provided information with respect to the issuance of a search warrant during the investigation of the murder of Jerri Connelly. The application for the search warrant contained a statement indicating that Jerri Connelly was in possession of a pound of cocaine, which he had stolen from a Burlington drug dealer. A subsequent investigation by police did not confirm this information and the cocaine was never found. At the deposition Officer Holley refused to identify the informant. Defendant moved to require the State to reveal the name of the informant, which was denied by the court.

On appeal defendant says that it was material and essential to pursue this information to track down the individual with a motive for the murder of Jerri Connelly; and therefore the trial court erred in refusing to grant defendant's motion to reveal the name of the informant.

In *State v. Lamar,* 210 N.W.2d 600 (Iowa 1973), we discussed the basis for the so-called informer's privilege and said:

> [The] privilege is actually the State's right of nondisclosure as to identity of those persons who supply law violation information to officers charged with enforcement of any such law.
>
> This privilege is premised upon public interest in maintaining the flow of information essential to law enforcement.
>
> To be weighed against that interest, however, is an accused's right of access to facts necessary for the preparation and presentation of his defense, and to a fair trial.

Therefore, any determination as to whether an informer's identity is to be revealed requires a balancing of the aforesaid countering interests in light of the facts and circumstances peculiar to each case. Among facts to be considered in this weighing process are (1) nature of the offense charged; (2) defenses raised; and (3) potential significance of an informer's testimony.

The burden is inceptionally upon defendant to show cause for such disclosure.

. . .

But when showing is made by an accused that an informer's identity is material to his defense or essential to a fair trial the informer privilege disappears. 210 N.W.2d at 602–03.

In *State v. York,* 256 N.W.2d 922, 925 (Iowa 1977), we said that: "The decision on disclosure and identity of an informant must be made on a case by case basis. . . . Disclosure may be required in one case and not in another."

■ In order for the defendant to carry his burden of showing need for disclosure and overcome the public interest in the protection of the informer, he must show more than mere speculation an informer's identity may be helpful. *State v. Sheffey,* 243 N.W.2d 555, 559 (Iowa 1976); *State v. Battle,* 199 N.W.2d 70, 72 (Iowa 1972). The courts, however, "have generally held the identity of an informer must be disclosed when the informant participated in or witnessed the crime charged." *State v. Lamar,* 210 N.W.2d 600, 603 (Iowa 1973); *State v. Battle,* 199 N.W.2d 70, 71 (Iowa 1972).

■ The court was correct in ruling that defendant failed to sustain his burden of proof under our facts. In his motion to compel discovery defendant made the bare assertion that it would be in the interest of justice to require Officer Holley to reveal the name of the informant. The informant did not participate in nor did he witness the crime. The sole witness to the murder testified in court. Defendant did not make any showing the informer's identity was material to his defense or essential to a fair

trial. The public's interest in maintaining the flow of information essential to law enforcement must prevail.

This assignment is without merit.

*IV. Should defendant have been allowed to read from the Conard and Strickland depositions under Iowa R.Civ.P. 144(b)?* Defendant, citing Iowa R.Civ.P. 144(b), argues, that while there is nothing in the Strickland or Conard depositions which in and of itself would have proved defendant's innocence, he should have been allowed to read from Conard's and Strickland's depositions for any purpose as though they were parties to the action.

Defendant argues that Rule 144(b) should be applied in this criminal case, but cites no authority for this proposition other than the rule itself.

Iowa R.Civ.P. 1 provides: "These Rules shall govern the practice and procedure in all courts of the state, except where they expressly provide otherwise, or statutes not affected hereby provide different procedure in particular courts or cases."

■■■ Section 781.10, The Code 1977, provides: "A defendant in a criminal case, either after preliminary information, indictment, or information, may examine witnesses conditionally or on notice or commission, in the same manner and *with like effect* as in civil actions." (emphasis added).

The *like effect* language of section 781.10 when read in conjunction with Iowa R.Civ.P. 1 leads us to the conclusion that the depositions of Strickland and Conard may be used at trial in accordance with the Iowa Rules of Civil Procedure unless expressly provided otherwise in the Code. Nowhere in the Code is the use of depositions at a criminal trial specifically limited.

■■■ Iowa R.Civ.P. 144 provides in pertinent part:

Any part of a deposition, *so far as admissible under the rules of evidence,* may be used upon the trial or at an interlocutory hearing or upon the hearing of a motion in the same action against any party who appeared when it was taken, or stipulated therefor, or had due notice thereof, either:

. . . . .

(b) For any purpose if, when it was taken, *deponent was a party adverse to the offeror,* or was an officer, partner or managing agent of any adverse party which is not a natural person . . . . . .

(emphasis added).

In order for rule 144(b) to apply, it is necessary that Conard and Strickland be parties adverse to defendant and that the depositions be admissible under the rules of evidence. It is not necessary for us to determine if the depositions would be admissible under the rules of evidence because Conard and Strickland clearly are not parties adverse to defendant as the phrase is used in rule 144(b). For Strickland and Conard to be parties adverse to defendant it would be necessary that they be parties to the action. Only Horn was on trial in this proceeding and neither Conard nor Strickland can be said to be a party, even though they may have had an interest in the outcome of the trial as witnesses.

While there is no Iowa case directly on point, we said in *Gibbons v. Belt,* 239 Iowa 961, 965, 33 N.W.2d 374, 376 (1948) when construing section 11058, The Code 1939:[1]

As to who is a "party to the action" has not been definitely passed upon by this court. For the nearest approach to it, see *Dean v. Clapp,* 221 Iowa 1270, 268 N.W. 56. However, Prof. Greenleaf, on the question of "who are parties," in an oft quoted passage (1 Greenleaf on Evidence Sixteenth Ed., section 523) says: "Under the term *'parties,'* in this connection, the law includes all who are directly interested in the subject matter, and had a right to make defense, or to control the proceedings, and to appeal from the judgment. This right involves, also, the right

---

1. Section 11058, The Code 1939, provided: "The notice may be served by any person not a party to the action."

to adduce testimony, and to cross examine the witnesses adduced on the other side. Persons not having these rights are regarded as strangers to the cause."

In approving this language we held that an attorney was not a party to the action.

In applying the definition of *Gibbons* to the present case, we hold that Strickland and Conard were not parties to this criminal proceeding within the meaning of rule 144(b), and defendant could not read from the two depositions under that rule. *See also, e. g., Griffel v. Northern Natural Gas Company,* 257 Iowa 1140, 1144–45, 136 N.W.2d 265, 268 (1965) (to be an "adverse party" one must be prejudiced or adversely affected by a reversal or modification of judgment appealed from); and *Bales v. Iowa State Highway Commission,* 249 Iowa 57, 63, 86 N.W.2d 244, 248 (1957).

There is no merit in this assignment.

■ *V. Is the "dead man's statute" applicable to this criminal proceeding?* Horn challenges the competence of witnesses Conard and Strickland to testify regarding the decedent's demise. He contends section 622.4, The Code 1977, prohibits the admission of such testimony. He recognizes the language in *State v. Fowler,* 248 N.W.2d 511, 516 (1976), to the effect that section 622.4, the dead man's statute, is "ordinarily inapplicable to criminal prosecutions." However, he argues, this is the extraordinary case. He cites no other authority for his position.

We find our holding in *Fowler* and the authorities cited therein to be equally dispositive of this asserted ground for error. As Horn's objection was based on the statute, he is limited by its terms. Operation of the statute is confined to actions "against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person, or the assignee or guardian of such insane person or lunatic." § 622.4. Facially, it has no application to the present case. *See also Hamilton v. Bethel,* 256 Iowa 1357, 131 N.W.2d 445 (1964). In construing section 622.4, we have limited application of the statute to its precise terms and have not

expanded it by judicial construction. *See, e. g., Thuman v. Monroe County Truck and Implement Co.,* 255 N.W.2d 331, 332 (Iowa 1977); *Laing v. State Farm Fire Casualty Co.,* 236 N.W.2d 317, 319 (Iowa 1975). Also, we have been unable to find any jurisdiction which has applied a dead man's statute to a criminal proceeding. Such a result being consistent with both the language of section 622.4 and our previous constructions of that section, we hold that section 622.4 has no applicability in this case.

■ *VI. Did the court err in allowing the state to ask leading questions?* Defendant complains that a number of questions asked by the State were leading and that the trial court abused its discretion in allowing them to be answered, thereby constituting reversible error.

"Where the question assumes any fact which is the controversy, so the answer may really or apparently admit that fact, it is leading. Likewise a question admitted of being answered by a simple 'yes' or 'no' has been regarded as leading." *Giltner v. Stark,* 219 N.W.2d 700, 713 (Iowa 1974).

"This court has often stated that trial court has considerable discretion in admitting or excluding answers to leading questions and there must be a clear abuse of discretion to justify a reversal." *Giltner v. Stark,* 219 N.W.2d 700, 706 (Iowa 1974).

While it is true a number of questions asked by the State were leading, as defendant alleges, it cannot be said that the trial judge failed to exercise judgment in allowing them to be answered. We, also, find no clear abuse of that discretion justifying reversal on this ground.

■ *VII. Did the court improperly limit Conard's cross-examination regarding penal consequences of homicide?* Horn contends the court committed reversible error in limiting his cross-examination of Conard, who had pled guilty to a charge of murder. The court permitted Conard to be interrogated by defense counsel as to his knowledge of the penalty for first-degree murder, but not as to second-degree murder or man-

slaughter. In so inquiring, Horn was attempting to show the potential bias of Conard, who may have been testifying in an attempt to obtain leniency from the State. *See State v. Armento,* 256 N.W.2d 228, 229 (Iowa 1970). We hold as we did in *Armento,* that any error by the trial court was nonprejudicial.

As we noted in *Armento,* 256 N.W.2d at 229, a "defendant should be permitted wide latitude in seeking to show bias of an alleged accomplice who testifies for the prosecution." Conard's awareness of the possible penalties he might face was relevant as a means of showing bias. In *Armento* the trial court refused to allow defense counsel to question an alleged accomplice testifying for the prosecution regarding the penalty for first-degree murder. However, that ruling did not require reversal. We stated: "That the jury did not know precisely what Kocher believed the penalty to be could not materially have affected the jury's impression of his motivation in testifying for the State." *Id.* at 230.

Here, Horn *was* permitted to question the alleged accomplice, Conard, regarding his knowledge of the penalty for first-degree murder, although not as to the penalties for the lesser degrees of homicide. Thus, Horn's cross-examination was broader than that allowed in *Armento.* While it would have been within the discretion of the trial court to permit the questioning requested by Horn, we do not find the court's refusal to constitute reversible error.

**VIII.** *Should the State have been allowed to refer to and question concerning Charles Manson?* Defendant claims the State's questioning permitted by the court, over his objection, concerning Charles Manson and matters relating to or referring to Manson was irrelevant and immaterial.

During trial, the State examined Lori Forrester and Conard about statements defendant had made characterizing himself as Charles Manson.

Defendant objected to these questions as irrelevant and immaterial. The court overruled the objections, stating that the questions did not ask who Charles Manson is or what he stands for, but rather called for testimony relating to defendant's statements characterizing himself as Charles Manson.

Determinations of relevancy and materiality rest largely in the discretion of the trial court. *State v. Fuhrmann,* 257 N.W.2d 619, 625 (Iowa 1977).

Although it would have been preferable for the court not to allow this evidence on direct examination of the State's witnesses, we cannot say it was an abuse of the court's discretion to admit evidence that defendant characterized himself as someone else.

*IX. Were drug-related materials taken from the Strickland apartment and the Horn residence properly received in evidence?* During trial, the State introduced drug-related items and drug paraphernalia obtained from Strickland's apartment and Horn's residence. Defendant objected to the admission of these items on the grounds that they were irrelevant, immaterial, and of no probative value. The court overruled the objections and admitted the exhibits into evidence.

The State contends that the drug-related items and the drug paraphernalia constitute part of the *res gestae* of the crime.

"We have held, with notable exceptions, that evidence of the commission of crimes other than the one with which defendant is presently charged, is inadmissible." *State v. Oppedal,* 232 N.W.2d 517, 520 (Iowa 1975); *State v. Fetters,* 202 N.W.2d 84, 91–92 (Iowa 1972).

One of the exceptions is where the evidence of the other crime is part of the *res gestae* of the crime charged. "The admissibility of such evidence is largely within the discretion of the trial court. So is the question of the relevancy of such evidence. We have not, however, hesitated to reverse when the jury was allowed to consider plainly irrelevant and prejudicial evidence." *State v. Oppedal,* 232 N.W.2d 517, 520 (Iowa 1975) (citations omitted). "As such evidence tends to be not merely irrelevant, but tends to show other crimes or misconduct

on the part of the defendant, we subject it to closer scrutiny." *Id.* at 522; *State v. Lyons,* 210 N.W.2d 543, 546 (Iowa 1973).

We said in *Oppedal:*

> In prior cases in which this court has permitted the admission of evidence under the *res gestae* doctrine, the evidence has been related to the defendant directly, by virtue of the fact the acts done or statements made have been by the defendant himself, or indirectly, where the defendant and another have acted in concert against one victim. In such cases, we have been able to find from the record the acts and statements of the defendant were integral parts of the crime with which he was charged, . . . or at least so closely related in point of time and place and so intimately associated with each other they form a continuous transaction, the whole of which may be shown, . . . .

232 N.W.2d at 522–23.

■ Evidence of another offense is admissible under the *res gestae* doctrine "where it is so related to the offense charged that proof of the former tends to establish the latter, also where such evidence tends to identify the accused as the person who committed the crime charged. Evidence otherwise competent to prove some fact material to the crime charged is not inadmissible because it tends to prove defendant guilty of another crime." *State v. Dunne,* 234 Iowa 1185, 1195, 15 N.W.2d 296, 301–02 (1944); *see also State v. Johnson,* 224 N.W.2d 617 (Iowa 1974); *State v. Fetters,* 202 N.W.2d 84 (Iowa 1972).

■ In the present case the State was attempting to show that the defendant hired Tim Conard to kill Jerri Connelly for him. According to the State's evidence, defendant offered and finally paid Conard three ounces of marijuana and the murder weapon for the killing. The drug-related items and drug paraphernalia taken from defendant's residence tend to show that defendant possessed marijuana, which he could use to make the promised payment. Because Conard lived at Strickland's apartment, the existence of drug-related items

and drug paraphernalia there tend to show that Conard was a user of marijuana and likely to take payment in such a form.

In addition, the State attempted to show that Horn maintained a degree of control over Conard and that, therefore, Conard would be likely to commit the murder of Jerri Connelly at defendant's request. The State attempted to do this by showing that defendant supplied Conard with his drugs.

Because Horn attempted to show that he had no motive to kill Connelly but that Conard did have such a motive, the evidence of control and payment become even more material to the case. The material facts of payment and control allow the admissibility of the drug-related items and the drug paraphernalia found at Strickland's apartment and Horn's residence.

No error exists here.

*X. Was the jury correctly instructed regarding corroboration of accomplice testimony?* Prior to the trial of defendant, Conard pleaded guilty to the murder of Jerri Connelly. Conard was to have a degree of guilt hearing and be sentenced after defendant's trial.

There was testimony at trial tending to establish the following facts. Ernest Strickland apparently knew what Conard was going to do before the murder of Connelly. After the killing, Strickland wiped the fingerprints from the gun used to commit the murder and attempted to alter the ballistics. He was trying to cover up his involvement in the crime. Strickland advised Conard to leave town. Then Strickland himself fled to Texas.

The court submitted the issue of whether Conard and Strickland were accomplices to the jury for its determination. The court made no ruling as a matter of law on the issue. "When the testimony is disputed or, if undisputed, when different inferences may be drawn from it, the question is one for the jury." *State v. Martin,* 274 N.W.2d 348, 349 (Iowa 1979). If the jury found either Conard or Strickland, or both, to be accomplices, the law requires that their testimony be corroborated. *Id.* at 349; § 782.-

5, The Code 1977. The State does not now dispute that Conard was an accomplice nor does it dispute that Strickland was an accomplice or potential accomplice for the purpose of the jury instructions.

The court gave the following instruction No. 8, to which the defendant excepted and now claims was error:

The term 'accomplice' refers to and includes all persons who participate in the crime with which the defendant is charged; that is, all persons who knowingly and voluntarily cooperate or aid and abet in its commission.

Under the law of this State, a defendant cannot be convicted of a public offense upon the evidence of accomplices, unless their testimony is corroborated by other evidence which shall tend to connect the defendant with the commission of the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense or circumstances thereof. The corroboration may be by either direct or circumstantial evidence.

If you find that any witness offered by the State is an accomplice, as that term is herein defined, the defendant cannot be convicted of the offense or offenses charged against him upon the testimony of such accomplice alone unless there is other evidence tending to connect the defendant with the commission of the offense charged; and such other evidence, if any, is not sufficient if it merely shows that the offense was committed or the circumstances thereof, but it must be such as tends to point and single out the defendant as one of the persons who committed it.

This instruction conformed with the uniform instruction prepared by the Iowa State Bar Association. *See* II Iowa Uniform Jury Instruction No. 501.8 (1970).

Defendant objected to the instruction and excepted to the court's failure to make the following changes in the instruction:

1) Insert as the last sentence to the second paragraph, "The testimony of one accomplice cannot corroborate the testimony of another accomplice.";

2) Add between paragraph two and three "If you find that Timothy Conard is an accomplice in the crime, and if you find Ernest Strickland is an accomplice in the crime, then neither the testimony of Timothy Conard may corroborate the testimony of Ernest Strickland, nor may the testimony of Ernest Strickland corroborate the testimony of Timothy Conard."; and

3) Change in last paragraph, the second time it is used in the paragraph, the word "accomplice" to "accomplices."

It is necessary to read the court's instructions as a whole when determining whether there has been error. *State v. Jones*, 193 N.W.2d 509, 513 (Iowa 1972); *State v. Morelock*, 164 N.W.2d 819 (Iowa 1969). "The object of requesting an instruction is to see that the subject is covered . . . ." *Jones*, 193 N.W.2d at 514–15. "A trial court is not required to instruct in the language of requested instructions if the subject is covered in the court's own instructions." *Id.* at 514; *See State v. Everett*, 214 N.W.2d 214, 219 (Iowa 1974) (citing *Jones* with approval). "A party cannot complain if instructions fail to emphasize circumstances favorable to him. This is precisely what instructions should avoid." *State v. Robinette*, 216 N.W.2d 317, 318 (Iowa 1974); *See State v. Seehan*, 258 N.W.2d 374, 379 (Iowa 1977).

Defendant says the instruction given by the court was error because he contends *State v. Everett*, 214 N.W.2d 214 (Iowa 1974), requires a change in the instruction. In *Everett* the trial court changed the uniform instruction to read that "defendant could not be convicted on the uncorroborated testimony of an 'accomplice or accomplices.'" *Id.* at 219. However, the trial court refused to instruct the jury that "[t]he testimony of one accomplice cannot be corroborated by that of another accomplice . . .", as requested by defendant Everett. *Id.* at 219. In *Everett* we said: "We believe the instruction as changed by the trial court adequately incor-

porated the concept embodied in defendant's request . . ." and found no error in the trial court's instruction. *Id.* at 219.

In *Everett* we were not faced with the precise instruction presented here and only held that the instruction as given in that case was sufficient.

Instruction 8 stated in the first paragraph the term "accomplice" refers to all *persons* who participate in the crime and all *persons* who aid and abet in its commission. The second paragraph states a defendant cannot be convicted upon the evidence of *accomplices* unless their testimony is corroborated.

We believe the language in instruction 8 was sufficient to advise the jury that evidence of one or more accomplices cannot convict a defendant unless corroborated by other evidence and adequately incorporated the concept of defendant's requests.

*XI. Was there sufficient corroboration of the accomplice testimony?* Horn contends there was insufficient evidence to corroborate any testimony of accomplices tending to connect him with the commission of the crime. Section 782.5, The Code 1977 provides: "A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Horn timely moved for a directed verdict on this ground.

"Whether there is corroboration testimony is a question of law, but its sufficiency is a question of fact for the jury." *State v. Nepple,* 211 N.W.2d 330, 331–32, (Iowa 1973); *see State v. Cuevas,* 282 N.W.2d 74 (Iowa 1979).

■ We have said that corroborating evidence need not be strong. All that is necessary is that the accomplice(s) be corroborated in some material fact, which tends to connect the defendant with the crime, and therefore supports the credibility of the accomplice(s)' testimony. It is not necessary that the evidence corroborating the accomplice(s)' testimony relate to all of the elements material to the defendant's commission of the crime. *Cuevas,* 282 N.W.2d at 78 (Iowa 1979); *State v. Martin,* 274 N.W.2d 348, 350 (Iowa 1979). "Such evidence may be direct or circumstantial. It must be inculpatory but need not be entirely inconsistent with innocence. Each case must be judged on its own facts." *State v. Vesey,* 241 N.W.2d 888, 890 (Iowa 1976); *State v. Neppel,* 211 N.W.2d 330, 332 (Iowa 1973) (and citations). "There may be a combination of circumstances which entitled the jury to reach the conclusion the accomplices' testimony has been corroborated." *Neppel,* 211 N.W.2d at 332; *State v. Cornwell,* 189 N.W.2d 611 (Iowa 1971).

■ There was substantial evidence corroborating the testimony of Conard and Strickland tending to connect Horn with the crime. Officers James Schreiner and Jay Helley testified that they discovered Connelly's body in the sewer pit. Officer Wendell Patton testified he found the gun under the broiler in Strickland's apartment. Dr. Ralph Rettenmaier testified that he performed the autopsy, which revealed that Connelly had been shot once through the heart, and there were fractures in Connelly's head which led him to believe Connelly had fallen on his head. Darwin Chapman of the Bureau of Criminal Investigation identified scratches inside the gun. Steve Poggemiller testified: He was serving a sentence in the Des Moines County jail and that his cell was located next to defendant's; that Horn told him he had asked Strickland to kill Connelly but Strickland refused; that defendant also told him that Tim Conard had done the killing for him. Poggemiller also testified he heard Horn tell Connelly's sister Tonya that she had better keep quiet or he would snuff her like he snuffed her brother. This statement was also heard by Tonya Connelly, Tammy Smith, and Officer Mike Johnstone.

Kelli Ashby testified that she was at the Strickland apartment on December 7. She stated that Conard was there but left for about fifteen to twenty minutes, returned

for a few minutes, and then left again. She said that the second time Conard left he had a gun with him, and when she mentioned this to Strickland he said something about Connelly. Ashby testified that Conard later returned for a short time, then left again. When he returned this time, he had some marijuana with him.

Lori Forrester testified that she was also at Strickland's apartment on December 7. She testified to substantially the same facts as Kelli Ashby. She also testified that Conard appeared nervous and upset, and that Conard stated that he had killed Jerri Connelly.

The testimony of Strickland and Conard was adequately corroborated by the above and other testimony in the record, which tended to connect defendant with the crime.

There is no merit in this assignment.

■ *XII. Does the mandatory sentence of life imprisonment constitute cruel and unusual punishment?* The court sentenced defendant to life imprisonment pursuant to section 690.2,[2] The Code 1977. Defendant contends that because he was twenty years old, the trial judge's application of a mandatory life imprisonment sentence without possibility of parole was cruel and unusual punishment in violation of the United States Constitution.

We held in *State v. Furhmann*, 261 N.W.2d 475 (Iowa 1978), that the mandatory sentencing requirement of section 690.2, The Code, was not unconstitutional and stated: "A state has wide latitude in fixing punishment for crimes. Our legislature has the power and the responsibility to define crimes and prescribe punishment. Life imprisonment for first-degree murder is not so disproportionate to the seriousness of the offense as to shock the conscience or sense of justice." *Id.* at 479–80 (citations omitted); *State v. Fitz*, 265 N.W.2d 896, 899 (Iowa 1978).

Our holding in *Furhmann* is dispositive of this issue.

No error appears.

*XIII. Should defendant's motion for new trial have been granted?* Defendant asserts four grounds for reversal because his motion for new trial was overruled. All of these grounds were based on his claim the county attorney and Conard's attorney gave signals to Conard during his cross-examination, thereby indicating how he should answer.

Because the case is being reversed for other reasons, and it is unlikely the alleged signalling matter will recur on retrial, we deem it unnecessary to review the grounds based on denial of the new trial motion.

*XIV. Did defendant claim excessive printing costs?* The record reflects that defendant is indigent and that his appeal counsel was appointed by the trial court. The papers filed on this appeal carry certificates of the following printing costs: Appendix, 934 pages, $2735.50 (approx. $2.93 per page); appellant's brief, 53 pages, $447.75 (approx. $8.45 per page); appellant's reply brief, 21 pages, $202.50 (approx. $9.64 per page).

We held in *State v. Cuevas*, 282 N.W.2d 74, 83 (Iowa 1979), that where appeal counsel has been appointed by the court to represent defendant, section 815.7, The Code 1979, applies and that Iowa R.App.P. 16(c) also applies in that it is not inconsistent with section 815.7 pursuant to R.App.P. 102 governing the appeal of criminal cases. We further said that printing costs must be reasonable and cannot presently exceed the sum of $3.00 per page under *Lucas v. Pioneer*, 256 N.W.2d 167, 180 (Iowa 1977). We held in *Cuevas* that *Pioneer* applies to criminal cases. Therefore, defense counsel is entitled to actual printing expense but not in excess of $3.00 per page.

---

2. Section 690.2, The Code 1977, provides:

All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary, is murder in the first degree, and shall be punished by imprisonment for life at hard labor in the penitentiary and the court shall enter judgment and pass sentence accordingly.

For the reasons stated in Division I and II, this case is reversed and remanded for new trial.

REVERSED AND REMANDED.