STATE of Iowa, Appellee,

v.

Mark Edwin TROST, Appellant.

No. 58846.

Supreme Court of Iowa.

July 30, 1976.

Ronald D. Bonnett, Lenox, for appellant.

Richard C. Turner, Atty. Gen., Thomas Mann, Jr., Asst. Atty. Gen., and Jerrold B. Oliver, County Attorney, for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

Defendant Mark Edwin Trost appeals his conviction and sentence for delivery of amphetamines in violation of § 204.401(1)(b), The Code. We reverse and remand for new trial because we find the trial court erred in overruling defendant's exception to the court's refusal to instruct the jury it could consider the conduct of a government informant on the issue of entrapment. We also adopt a rule in this case that the credibility of a witness may be attacked by any party, including the party calling him.

Four questions are presented: (1) did the court err in refusing to instruct the jury it could consider the conduct of a government informant on the issue of entrapment? (2) did the trial court err in refusing to give a limiting instruction regarding evidence of other crimes? (3) did the court err in refusing to permit defendant to inform the jury that a defense witness had been granted immunity? and (4) did the court err in putting the burden of proof on defendant, after conviction, to prove he was an accommodation offender?

The charge arose from the alleged sale of defendant of 2300 amphetamines to two state undercover agents for $315 on October 10, 1974, in Madison County. The undercover agents were Ernest Baty, Jr., and Harold James Grasman, special agents with the division of narcotics and drug enforcement of the Iowa department of public safety. In August 1974 the Creston police chief introduced the agents to Charles Ribbey, who was then incarcerated in the Creston jail. The agents employed Ribbey to help arrange a drug purchase from defendant, a resident of rural Union County suspected by the police chief to be engaged in drug traffic. Ribbey and defendant were not acquainted.

A few weeks later Ribbey approached defendant in downtown Creston and asked him if he knew where Ribbey could buy a half pound of marijuana. Defendant said he did not. Ribbey asked him about amphetamines and received the same response. Ribbey told defendant he had a friend who would like to talk to defendant that evening about the purchase of drugs.

Defendant was downtown that evening with a date. He was approached again by Ribbey, this time accompanied by agent Baty, whom he introduced to defendant as "Rex". Baty told defendant he wished to purchase drugs. He said he had associates in Detroit who would pay large sums of money for a regular supply of amphetamines. Baty asked defendant to think about this and told him Ribbey would probably get in touch with him later.

About a week and a half after that incident, Ribbey approached defendant in a Creston tavern. Defendant testified that Ribbey asked him if he had investigated the availability of amphetamines for sale by defendant to "Rex". Defendant said he told Ribbey he had not and had forgotten about the matter completely. He then testified Ribbey reminded him of the large amounts of money to be made and urged him strongly to do business with "Rex". Defendant testified he was unemployed and broke; he was interested in the possibility of making a large amount of money. Ribbey told defendant "Rex" wanted to meet him to purchase drugs the following weekend. Defendant agreed to look for drugs to sell.

Defendant testified he was not able to locate any amphetamines. When he met Baty that weekend, defendant testified Baty was very upset, disgusted and impatient with him because of his failure to obtain amphetamines for sale. Defendant asked for more time. When he could not find any amphetamines to sell Baty that evening, he said he remembered he had several LSD tablets, called orange barrels, which a friend had given him earlier in the week. He said he sold these to Baty for

one dollar per tablet in an effort to mollify him. Baty seemed encouraged by this. He obtained defendant's phone number and said he would get in touch with him again soon.

Defendant testified that the next morning he met a friend, Jim Means, at the county jail. He said Means told him he had amphetamines which he needed to sell to raise money for bail on a drug charge. Defendant said he agreed to help Means by selling the amphetamines to Baty. When Baty called him later in the morning, defendant told Baty he had amphetamines to sell and arrangements were made for Baty and Grasman to meet defendant to carry out the transaction. Later that day, after several additional phone conversations, the trio met. Baty introduced Grasman as "Hal", his "money man" from Detroit. After negotiating for a few minutes, the agents paid defendant $315 for 2300 amphetamine tablets. The present conviction is based on that sale.

I. *The entrapment instruction.* In its instruction on the defense of entrapment, the trial court told the jury in part:

"In applying this instruction, you should consider the course of conduct between the agents of the police, Ernest Baty and Harold Grasman, and the defendant. The transactions leading up to the offense, the interaction between the agents and the defendant and the defendant's response to conduct of the agents, are all to be considered by you in judging what the effect of the agents' conduct would be on a normally law-abiding person."

Defendant took timely exception to the court's failure to mention informant Ribbey in this instruction as an agent of the police whose conduct should also be considered in relation to entrapment. The court overruled the exception, and the ruling is assigned as error.

■ If law enforcement officers use an individual to help them arrange the commission of a crime by another person, the officers cannot disassociate themselves from the inducement such individual offers

in the course of his efforts for the officers. *State v. Ostrand,* 219 N.W.2d 509, 512 (Iowa 1974). In the present case, the officers admitted Ribbey was acting as a "go-between" for them. The jury could find Ribbey's statements to defendant were a material part of the inducement which led to defendant's sale of amphetamines to the officers. If the jury believed defendant, it could find defendant would not have sold the drugs without persuasion from Ribbey when Ribbey approached him in the tavern a week and a half after introducing him to Baty. Defendant testified Ribbey led him to believe he could make $30,000 to $40,000 if he would take advantage of the opportunity to do business with Baty. Defendant said he assumed Ribbey had some kind of commission arrangement with Baty.

The trial court erred in refusing to inform the jury it should consider Ribbey's conduct as well as that of Baty and Grasman on the issue of entrapment.

■ II. *The requested limiting instruction.* The trial court admitted a tape recording of several telephone conversations between Baty and defendant which occurred on October 10, 1974, leading up to the sale. During one conversation Baty mentioned defendant's earlier sale of LSD and the possibility of additional criminal activity if defendant would sell amphetamines to Baty. Defendant requested that the court instruct the jury at the time the tape was received in evidence to disregard mention on the tape of crimes other than the one charged. The court refused to do so but told defense counsel that any proposed cautionary instruction submitted by counsel would be considered by the court in connection with the court's instructions to the jury upon submission of the case.

When defense counsel was later taking exceptions to the court's final draft of proposed instructions, he again requested "some manner of instruction * * * with respect to the limited purpose for which they may consider the extraneous testimony dealing with other crimes and possible crimes * * *." The trial court ascertained defense counsel did not have a

requested instruction prepared and offered him time to prepare one. Counsel declined, acknowledging he did not have any appropriate phraseology in mind.

Defendant now contends the court erred in failing to give a cautionary instruction.

We do not believe it was unreasonable for the court to put the burden on defense counsel to prepare a requested cautionary instruction. Defense counsel was unable to specify what he thought such an instruction should say. In these circumstances, the trial court did not err in refusing to instruct on the subject. See *State v. Blyth,* 226 N.W.2d 250, 273 (Iowa 1975).

■ III. *Disclosure of immunity.* Defendant called Jim Means, the friend for whom he claimed he sold the amphetamines to the officers, as a witness. After identifying himself and being asked if he had been subpoenaed to appear, Means refused to answer further questions on the ground of possible self-incrimination. Defense counsel objected to Means' assertion of the privilege. Out of the presence of the jury, the county attorney moved the court to grant Means immunity in accordance with § 782.9, The Code. The court sustained the motion. The county attorney asked the trial court to prohibit defense counsel or any defense witness from disclosing the grant of immunity to the jury. The court did so. Defendant contends the court erred in prohibiting disclosure of the grant of immunity.

The State contends defendant was properly prohibited from showing Means received immunity because defendant could not impeach his own witness. In addition, the State argues Means' testimony confirmed defendant's version of events so defendant was not harmed by his inability to inform the jury of the grant of immunity. At the same time, the State is unable to specify what harm would have been caused by such disclosure.

Because this case is reversed and remanded on the basis of the error discussed in Division I, we need not decide whether defendant was prejudiced by the court's rul-

ing. We do decide, however, that defendant should have been allowed to show the grant of immunity.

The rule relied on by the State, that a party may not impeach a witness whom he calls to testify, is of common-law origin. It is based largely on the theory that a party vouches for a witness he calls and is thus bound by his testimony. *State v. Hobbs,* 252 Iowa 432, 439, 107 N.W.2d 238, 242 (1961). As this rule evolved in our cases, it was modified somewhat. Direct impeachment was not permitted, but indirect impeachment was allowed, such as showing by other evidence that the witness made prior inconsistent statements. A party was permitted to contradict his own witness by other testimony. *State v. Tornquist,* 254 Iowa 1135, 1156, 120 N.W.2d 483, 495–496 (1963).

A 1965 amendment to § 624.1, The Code, modified the rule further for the situation where the witness is or represents an adverse party. In relevant part, the statute provides:

"A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."

The common-law rule prohibiting impeachment by a party of his own witness has been subjected to strong criticism. See, e. g., IIIA Wigmore on Evidence §§ 896–899 (p. 665: "There is no substantial reason for preserving this rule—the remnant of a primitive notion"); McCormick on Evidence § 38 (Second Ed. 1972); Ladd, Impeachment of One's Own Witness—New Developments, 4 U.Chi.L.Rev. 69 (1936); I Morgan, Basic Problems of Evidence p. 64 (1954) ("The fact is that the general prohibition, if it ever had any basis in reason, has no place

in any rational system of investigation in modern society and all attempts to modify or qualify it so as to reach sensible results serve only to demonstrate its irrationality and to increase the uncertainties of litigation".). It has been rejected by legislatures and courts. See, e. g., *United States v. Freeman,* 302 F.2d 347, 350–351 (2 Cir. 1962) cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316; *Gray v. State,* 525 P.2d 524, 526 (Alaska 1974) ("We have repeatedly rejected the wooden common law evidentiary rule that a party may not impeach its own witness, and we take this opportunity to do so once again."); *Selover v. Bryant,* 54 Minn. 434, 56 N.W. 58 (1893).

The rule has been rejected in the Uniform Rules of Evidence (1974), recommended for adoption in all the states by the National Conference of Commissioners on Uniform State Laws. Rule 607, Uniform Rules of Evidence, provides, "The credibility of a witness may be attacked by any party, including the party calling him." This provision is identical to rule 607, Federal Rules of Evidence, adopted by Congress for use in the federal courts. In recommending the rule, the Supreme Court advisory committee noted:

> "The traditional rule against impeaching one's own witness is abandoned as based on false premises. A party does not hold out his witnesses as worthy of belief, since he rarely has a free choice in selecting them. Denial of the right leaves the party at the mercy of the witness and the adversary."

In *Chambers v. Mississippi,* 410 U.S. 284, 296, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973), the Supreme Court said:

> "Whatever validity the 'voucher' rule may have once enjoyed, * * * it bears little present relationship to the realities of the criminal process. It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity. Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony.

But in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them."

We think this reasoning applies equally in civil cases.

■ We reject the rule that a party may not impeach his own witness. We believe it is an anachronism which serves no useful purpose in the law of evidence; it inhibits rather than assists the search for truth. We adopt rule 607, Uniform Rules of Evidence. Henceforth, in all trials in this state, the credibility of a witness may be attacked by any party, including the party calling him.

It follows that upon retrial of the present case, if Means again testifies, defendant shall be permitted to show he was granted immunity.

IV. *The accommodation proceeding.* Because the case is reversed and remanded for new trial, we do not reach defendant's contention the trial court erred in placing the burden on him in the postconviction accommodation proceeding to prove he sold the amphetamines as an accommodator. If defendant is again convicted, the accommodation issue shall be determined in accordance with the principles enunciated in *State v. Monroe,* 236 N.W.2d 24 (Iowa 1975).

REVERSED.