**STATE of Iowa, Appellee,**

v.

**Quinton L. DONELSON, Appellant.**

**No. 63595.**

Supreme Court of Iowa.

Feb. 18, 1981.

Jerald W. Kinnamon and Jon M. Kinnamon, Cedar Rapids, and Walter D. Braud and Dennis A. DePorter, Rock Island, Ill., for appellant.

Thomas J. Miller, Atty. Gen., Richard L. Cleland, Asst. Atty. Gen., and William E. Davis, Scott County Atty., for appellee.

UHLENHOPP, Justice.

This criminal appeal involves five issues which arose in a first-degree sexual abuse prosecution of defendant Quinton L. Donelson. Defendant's companion on the occasion in question was Darren Dooms.

The jury could find from the evidence in defendant's trial that defendant and Dooms, juveniles aged 15, were together on the day of the events. In the afternoon they had a pizza and beer. At some later time defendant sniffed white powder called "angel dust." At about 7:00 p. m. they went to a junior high football game, and at approximately 8:00 p. m. they went to an establishment called Shakey's.

Dooms had a switchblade knife which he had been carrying all day. He was a State's witness at defendant's trial. He testified in part:

A. Well, it was about 8 o'clock so we started to leave because—and we started to walk, go down Thirty-sixth Street and there was a girl up up there and he [defendant] asked to see my knife.

. . . .

And he asked to see my knife. And so I thought he was just going to look at it again, like he was all day, so I give it to him. There was a girl up ahead and, down here somewheres, and we was just on Thirty-sixth and he said he was going to get her or something. And then he took off running after her and I yelled at him and turned around and she ran into the street and he grabbed her. And I ran up, a little farther up by some parked buses and then I seen him by the fence and what looked like he stabbed her. So I ran back and by that time he was out in the field somewheres; about out in the middle, I would say.

Q. What did you do? A. Well, I was trying to tell him to leave her alone and stuff and tell him to come on and I asked him what he was going to do with her and where he was going to take her. And he tripped her and said, "Right here;" and it was about in the middle of the field.

. . . .

Q. Then what happened? A. Then he tripped her on the ground and told her to take off her clothes and she said, "Is that all you're going to do," and he didn't answer her. And then I told her he wasn't going to hurt her. And then, after they got her clothes off, he got on top of her and told me to get the money out of her purse. And I just dumped the

stuff out of her purse and didn't take no money, just a couple pennies, I think it was about 15 cents at the most.

Q. Did he take any of his clothes off? A. No.

Q. Did he open his trousers in any way? A. Yeah.

Q. In what way did he do it? A. He just unsnapped his pants and unzipped 'em.

Q. Before he did that, did he force her to do anything? A. No.

Q. Nothing happened before he got on top of her? A. Well, he—well, him and her was having problems getting her pants off and he told me to unhook them from her shoe and so I did. And then he got on top of her.

Q. Do you remember any oral sex being involved? A. Yes, I do.

Q. And when did that happen? A. After he got off her and then, and then it happened after that.

Q. Do you remember what he said in exact quotes if you can? A. I don't remember.

Q. Who had the knife all this time? A. He did.

Q. Did he have it open or closed? A. Had it open.

Q. And then what happened? A. And then he got up and picked up the knife and told me to get on top of her.

Q. Did you? A. Well, yeah. I was scared and I really didn't know what I was doing so I did.

Q. Did you take your pants down? A. No.

Q. Did you open your pants? A. I started to, but—

Q. Did you expose your penis? A. I don't think so.

Q. Do you remember? A. At that point, I was just too scared. I don't remember.

Q. Who had the knife then? A. He did.

Q. What do you mean by oral sex? A. Well, he stuck his penis in her mouth.

Q. Did he have the knife then? A. Yeah.

Q. And then what happened? A. Then he said—he got back up and after I—then after he told me to—then when I came to my senses, then when I knew what I was doing, she told me she was hurt and her back was hurting. So I tried to help her and I took off her coat so I could see how bad her back was hurt and it was pretty bloody and I got really scared then. And he said the last girl narced him off and he said he was going to kill her and I said, "No, don't do that." And he said, "Well, then I'm going to knock her out." And I said, "No," and she started crying and said "No;" and the knife was pretty big and it would have probably killed her just by hitting her. And I said, "No, don't do that." I said, "Tie her up with her clothes." And he stuck the knife in the ground or something and I picked it up and put it in my back pocket.

Q. Did you ask him for the knife? A. No, he just stuck it in the ground.

And after he stuck it in the ground, I picked it up and I told him she laid on her belly and he started to tie her feet and I started to tie her hands and he acted like he was having trouble tying them. So he asked me for the knife back—I thought he was going to cut the clothes or something to tie her up—and I gave it back to him. And he got her hands tied around her feet and I got up and started to leave and I turned around and looked and he had his hand raised over her back, and it was like he was going to stab her in the back. And I said, "What are you going to do," and he said the last girl narced him off and he was going to kill her. I grabbed his hand and yanked him away and told him, let's just get out of there. So we took off running, we went around the regular football field, over behind the car sales place, and went around it to the creek and I told him to give me the knife and he did and I threw it and—

Q. Where did you throw it? A. Towards the creek. I don't—

Q. What creek is that? Do you know? A. I think it is Duck Creek.

When the time arrived for cross-examination of Dooms, defense counsel desired to show a plea bargain by the State and Dooms. Counsel claimed that in return for Dooms' testimony at defendant's trial, the State agreed to reduce the charge against Dooms from first-degree sexual abuse, which carries a mandatory life sentence, to an aggravated misdemeanor which carries imprisonment not exceeding two years or a fine not exceeding $5000 or both. §§ 902.1, 903.1(1), The Code 1979. The State's position in the trial court was that defendant should "avoid the use of sentencing or penalty or the penalty of any other crime of any other co-defendant...." The trial court ruled as follows:

The Court: I want to outline for defense counsel some of the parameters concerning cross-examination of this witness as it concerns and relates to the charge that is pending against the witness and what type of penalty it might carry as opposed to the charge that he might be allowed to plead guilty to and the penalty that it might entail.

This is a very sensitive issue concerning whether or not the Jury should have knowledge of the penalty involved in this crime. On the other hand, the defendant should be allowed considerable leeway in testing the credibility to give in defendant's [sic] testimony and as it might be affected by a reduced charge and the Court has come to the conclusion that for the purpose of impeachment, and that's all, such cross-examination could go to the Jury. As to his credibility, it is not necessary that the Jury know the penalty involved in the crime to which he would be allowed to plead. The simple fact being if they know he is allowed to plead to a lesser charge and that the lesser charge would carry a lesser penalty, his credibility would be successfully impeached, at least to the extent it may be impeached by showing the motive he has for testifying. Understood?

Defense counsel stated:

Mr. Feuerbach: First of all, in regard to the issue of the defendant or Mr. Dooms, excuse me, receiving a lesser penalty in regard to his testimony today has already been touched upon by the State in its examination and should be allowed to be more fully explored by the defendant. Secondly, in citing case of *State vs. Trost*, 244 N.W.2d 556, Iowa 1976, I think the import of that case is that the defendant should have a right to fully explore any and all plea bargains and or the plea bargain process in regard to defendants or persons that are accomplices in the actual charge and I think also—

The Court: 244 what, Mr. Feuerbach?

Mr. Feuerbach: 556. Also, I would state I think it does have a bearing on the impeachment issue to show exactly what Mr. Dooms is being—the fact that he was being allowed to plead to a lesser charge may in fact mean only a slight reduction or it may mean a vast reduction in the minds of the Jury, so that they are able to judge exactly how great an impact that actually has as an impulse.

The Court: I would allow you to ask him, for instance, if it would be a misdemeanor or that it would be reduced from a felony to a misdemeanor. I think the only thing—I haven't read your case yet, but I will. I think the only thing I want you to avoid is get before the Jury that the penalty involved in the crime charged against Mr. Donelson is life imprisonment. That would have a tremendous impact on the Jury. Punishment that might be imposed by the Court is not a matter for consideration. They are to decide the facts, whether or not the occasion happened in the way the State charged it; and it would, in my opinion, unduly prejudice and unduly influence by being made aware of the penalty. So that is the only restriction I am placing on your cross-examination.

In accordance with the court's ruling, defense counsel showed by Dooms that in consideration of Dooms' testimony, the State promised to reduce the charge against Dooms from a felony to an aggravated misdemeanor.

The victim of the attack testified that defendant stabbed her and compelled her to commit oral sex upon him, and that both defendant and Dooms had sexual intercourse with her.

A physician examined the victim later the same evening. He testified that she had puncture wounds on her back and a partially collapsed lung "quite possibly produced by the puncture wound," and that tests indicated she had undergone intercourse within one to six hours previous to the tests.

The record contains additional evidence. The jury found defendant guilty as charged, the court sentenced him to life imprisonment, and he appealed.

I. *Cross-examination of Dooms.* Defendant first contends that the trial court erroneously restrained him from developing on cross-examination the full facts about the plea bargain between the State and Dooms as bearing on Dooms' credibility as a witness, especially the magnitude of the reduction in Dooms' penalty in exchange for testifying against defendant. The State staked much on Dooms' testimony as shown by the prosecutor's remark to the jury in opening statement: "The first witness that I intend to call today is Darren Dooms, the accomplice. He will take the stand and tell you exactly what happened. Straight forward he will tell you where it happened, what happened, how it happened."

Defendant's contention has merit. Dooms was a cardinal witness against defendant. Full cross-examination is a basic tool for ascertaining the truth in our adversary system. This is especially true when the witness is an accomplice who stands to gain by placing the major blame upon the accused.

A somewhat similar case is *State v. Armento*, 256 N.W.2d 228 (Iowa 1977). There the defendant desired to show the State's witness testified in order to escape the punishment for first-degree murder. This court stated:

We are concerned here with an effort to impeach a witness by showing his bias or interest. The right of a party to impeach a witness in this way is well established. A defendant should be permitted wide latitude in seeking to show bias of an alleged accomplice who testifies for the prosecution. The pendency of the same charge against an accomplice creates a reason for him to testify favorably for the State to curry favor in order to obtain leniency.

The principle involved here is accurately stated in Annot., 62 A.L.R.2d 610, 624, as follows:

"The rule allowing great or liberal latitude in the cross-examination by defendant of a witness for the prosecution, with respect to his motive for testifying, is especially applicable where such witness is a codefendant or accomplice of the accused, * * * and whose testimony against defendant may be influenced by a promise of, or hope or expectation of, immunity or leniency with respect to his case as a consideration for testifying against defendant."

*Id.* at 229 (citations omitted).

In that case no prejudice existed in refusing to let the accomplice testify whether he knew the penalty for first-degree murder: "That the jury did not know precisely what Kocher believed the penalty to be could not materially have affected the jury's impression of his motivation in testifying for the State." *Id.* at 230. We do not have that situation here. In this case the jury should have been allowed to know the substantial *quid pro quo* for Dooms' testimony: reduction from a charge carrying a mandatory life sentence to a crime carrying confinement for two years and a fine. The jury might regard this as strong motivation for Dooms to color his testimony or place the major blame on defendant.

Another recent decision is *State v. Horn*, 282 N.W.2d 717 (Iowa 1979). There the accused was allowed to show the penalty for first-degree murder but not for second-degree or manslaughter. We stated,

"While it would have been within the discretion of the trial court to permit the questioning requested by Horn, we do not find the court's refusal to constitute reversible error." *Id.* at 728. Again we do not have a parallel fact situation. *See also Armento v. Baughman*, 290 N.W.2d 11, 16 (Iowa 1980); *State v. DeWitt*, 286 N.W.2d 379, 386 (Iowa 1979) ("We now hold that except where no reasonable person could avoid finding a corrupt bargain has been struck, the accomplice's testimony should be weighed by the jury following liberal cross-examination to expose all factors which might influence the witness."); *State v. Hild*, 240 Iowa 1119, 1154–55, 39 N.W.2d 139, 159 (1949); *State v. Brown*, 146 Iowa 113, 118, 124 N.W. 899, 901 (1910); *State v. Kent*, 4 N.D. 577, 598–601, 62 N.W. 631, 638–39 (1895).

▆ The rule is unquestioned that a defendant may inquire about the concessions the accomplice hopes to receive or has been promised for his testimony, and where the State has gone so far as to enter into a bargain with the accomplice the defendant must be allowed to inquire about the terms of the bargain so that the jury may better understand the possible motivations of the accomplice as he sits on the stand. The court stated in *People v. Tyler*, 54 A.D.2d 723, 387 N.Y.S.2d 478, 479 (1976):

The issue herein is whether defendant was entitled to attempt to show that the crucial prosecution witness' motive to lie was increased because the witness, an indicted codefendant, faced a mandatory life sentence prior to his agreement to testify for the People in exchange for the prosecutor's recommendation that no jail sentence be imposed (i. e., that he would recommend a sentence of life-time probation) on his plea of guilty to a lesser charge. The trial court precluded examination of the mandatory maximum life sentence the codefendant faced on the ground that, if it were introduced, it would reveal to the jury the life sentence defendant faced. Cross-examination was permitted only as to the difference between the minimum sentence for the crime charged (six years) and the minimum sentence for the crime to which the codefendant pleaded (one year).

The maximum life sentence the codefendant faced was as significant as the minimum sentence, if not more so. The vital testing of the witness' veracity through cross-examination on this point was impermissibly abridged. Under the circumstances herein, the prosecutor, and not the defendant must bear the burden that the jury would know that defendant faced the same sentence (cf. *Davis v. Alaska*, 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347).

*See State v. Figueroa*, 98 Ariz. 146, 150, 402 P.2d 567, 569 (1965); *State v. Mathis*, 47 N.J. 455, 468–69, 221 A.2d 529, 536 (1966), *second appeal*, 52 N.J. 238, 245 A.2d 20 (1968), *reversed as to death penalty sub nom. Mathis v. New Jersey*, 403 U.S. 946, 91 S.Ct. 2277, 29 L.Ed.2d 855 (1971).

▆ The judgment must be reversed for another trial because of the restraints placed upon defendant's cross-examination of Dooms. Since the case will likely be retried, we consider other issues which will probably arise again.

II. *Rebuttal by illegally obtained evidence.* Soon after the sexual abuse allegedly occurred, defendant gave officers a statement purporting to describe the incident and his part in it. Prior to trial another District Judge suppressed the statement on defendant's motion as not shown to be legally voluntary.

At trial defendant testified about the alleged incident, admitting participation as to some parts and denying commission of other parts—most importantly, denying sexual contact with the victim. After questioning defendant on cross-examination, the prosecutor introduced defendant's statement over objection of defense counsel. The statement contained impeaching material and the trial court admitted it for impeachment.

A. Defendant contends that the statement could not be used for impeachment because it was involuntary. The term "involuntary" may be used in two senses with

respect to a statement given by a suspect. It may be used in the pre-*Miranda* sense of confessions which are not in fact free-will statements—for example, a statement obtained by prolonged and exhausting interrogation or by trickery or beating. *See State v. Clough,* 259 Iowa 1351, 1355, 147 N.W.2d 847, 850 (1967) ("Before admissions or confessions may be admitted in evidence as voluntary, pursuant to custodial interrogation, we have said it must appear the interrogation was free from coercion or mistreatment of the defendant, that the statements were given without threats or promises. *State v. Mullin,* 249 Iowa 10, 14, 85 N.W.2d 598, and citations."). Statements which are in fact involuntary are not admissible against the accused for any purpose. The United States Supreme Court stated in *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290, 306 (1978) (citations omitted):

> It is apparent from the record in this case that Mincey's statements were not "the product of his free and rational choice." To the contrary, the undisputed evidence makes clear that Mincey wanted *not* to answer Detective Hust. But Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne. Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial.

*See also New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979).

But "involuntary" has come to have a second meaning since the advent of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If a person is in custody without his attorney present, *Miranda* requires that he be given certain warnings of his rights before he may be questioned. Although the warnings are given, "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

■ Consequently, for responses of an uncounseled accused in custody to be admissible in evidence against him as *substantive* proof, the State must establish that the statements were voluntary in fact *and* that the accused knowingly and voluntarily waived his *Miranda* rights. *State v. Washington,* 257 N.W.2d 890, 895 (Iowa 1977) (citations omitted), *cert. denied,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1979) ("Upon proper objection or motion the State is required to prove by a preponderance of evidence that defendant's statements sought to be introduced as evidence in chief against him were made after an effective waiver of his *Miranda* rights, and were made voluntarily. These are separate issues.").

■ The situation is somewhat different when a statement of a defendant is used for *impeachment* at trial, as a prior statement which is inconsistent with his present testimony. The *Mincey* rule forbids such use of the statement if it was not in fact voluntary. *See also Oregon v. Hass,* 420 U.S. 714, 723, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570, 578 (1975) ("If, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness."); *Rivera v. Warden, Attica Correctional Facility,* 431 F.Supp. 1201, 1205 (E.D.N.Y.1977) (if statement would not have been admissible under pre-*Miranda* standards, it may not be used to impeach). But if the statement was given of the person's own free will, it may be used to impeach him although compliance with *Miranda* requirements did not occur. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In that case *Miranda* warnings were not properly given but the Court held the defendant's statements could nonetheless be used for impeachment. The Court stated:

> Petitioner's testimony in his own behalf concerning the events of January 7 con-

trasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief. *Id.* at 225, 91 S.Ct. at 645, 28 L.Ed.2d at 4.

The Court applied the *Harris* principle in the subsequent case of *Oregon v. Hass.* There the *Miranda* warnings were properly given, but the officer questioned the defendant and obtained inculpatory information after the defendant asked for an attorney. The *Hass* Court held the information was admissible under *Harris* for impeachment, stating:

The effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.

*Hass,* 420 U.S. at 723, 95 S.Ct. at 1221, 43 L.Ed.2d at 578.

The parties in this case have not presented to us for review the voluntariness question itself, and we must thus ascertain the basis on which the District Judge suppressed defendant's statement. We have carefully scrutinized the suppression order, and find that the Judge based it on *Miranda,* not on involuntariness in fact. Indeed, he found that the statement was actually voluntary.

The ruling discloses that the Judge was aware of the distinction between statements which are involuntary in fact and those which are not "legally" voluntary, as the Judge called them, because of a *Miranda* problem. He first found that the *Miranda* warnings were given in this case. He then found that defendant's statement was the product of defendant's free will. The Judge stated:

In this Court's opinion there is presented a situation in which it is clear that Defendant fully understood what he was doing when he made his confession to the officers, had the capacity to understand that he was waiving his rights to an attorney and was telling the truth as he remembered it, and *that the confession was voluntary,* no force or threats having been used by the officers at any time; but raising the question of whether the confession was *legally* voluntary. The recent case of *Interest of Thompson,* 241 N.W.2d 2 (Iowa 1976) sets forth guidelines for the Court to follow in answering the above question.

(Emphasis added.)

Proceeding with his ruling, the Judge expounded the cited *Thompson* case. *Thompson* was a *Miranda* case in which the person's statements were offered against him as substantive proof. In addition to a question relating to the *per se* rule, *Thompson* involved the validity of the waiver of *Miranda* rights by a juvenile who had been given the *Miranda* warnings. We found the State did not establish a knowing and intelligent waiver of *Miranda* rights and therefore termed the juvenile's statements "involuntary." We stated:

Viewing the evidence in the light most favorable to the prosecution, the State did not carry its subsequent heavy burden of proof to show Thompson subsequently waived either his privilege against self-incrimination or his right to counsel. *Miranda,* supra.

Considering the totality of the surrounding circumstances, including failure to provide him requested counsel, we hold Thompson's verbal confessions are involuntary.

*Interest of Thompson,* 241 N.W.2d 2, 4 (Iowa 1976).

On other occasions in the present suppression order the Judge made references in terms of *Miranda* rather than voluntariness in fact. Once he stated, "It was contended by counsel for [Thompson] that the Court should adopt a rule that a minor should be

held incapable of voluntarily and knowingly waiving his right to remain silent in absence of a parent, an adult friend or lawyer, a *per se* exclusionary rule." He then quoted directly from *Thompson* and included the following language by this court: " '[W]e again decline to adopt the concept every minor is incompetent as a matter of law to waive his rights to remain silent and to an attorney.' " This is all *Miranda*-type language.

Finally the Judge pointed out factual similarities between this situation and *Thompson*, and concluded:

> It is the opinion of the Court that under the totality of surrounding circumstances, giving due weight to the failure of the officers to provide consultation with a parent, guardian, custodian, adult friend or lawyer and to Defendant's mental abilities, the confession was not *legally* voluntary.

(Emphasis added.) A recent case similar to *Thompson* is *People v. Patrick W.*, 104 Cal. App.3d 615, 163 Cal.Rptr. 848 (1980), *review denied*, —— U.S. ——, 101 S.Ct. ——, 66 L.Ed.2d —— (1981).

■ We are convinced that the Judge suppressed the present statement because an effective *Miranda* waiver was not shown, rendering the statement "legally" involuntary, but that he found the statement to be voluntary in fact. This being the case, the trial court correctly held the statement was admissible for impeachment.

■ B. Defendant also contends that the statement could only be used to impeach him if it contradicted testimony he gave on direct examination beyond simply denying commission of the offense, citing *Hass, Harris,* and *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). *See also State v. Campbell,* 294 N.W.2d 803, 806 (Iowa 1980).

We cannot accept this contention for two reasons. One is that the statement did in fact contradict several items in the direct examination. The other reason is that present law holds the contradiction may be between the statement and *proper cross-ex-*

*amination. United States v. Havens,* 446 U.S. 620, 625–627, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559, 565–67 (1980). The cross-examination here was manifestly proper. *See State v. Jensen,* 189 N.W.2d 919, 923–24 (Iowa 1971) ("Cross-examination may deal with the *matters* inquired into on direct, and questions fairly within the area of those matters constitute proper cross-examination."). The cross-examination contained testimony which the statement impeached.

We do not find error in the use made of the statement for impeachment.

III. *Included offenses.* At the time of this trial we had not yet decided *State v. Johnson,* 291 N.W.2d 6 (Iowa 1980). Defendant contends the trial court should have submitted to the jury the included offenses of assault while participating in a felony, aggravated assault, and simple assault, under sections 708.1, 708.2, and 708.3, The Code. *See* Iowa R.Crim.P. 6(3). Under the rationale of *Johnson,* defendant's contention is well taken as to the *legal* test for included offenses.

As to the *factual* test for included offenses, three witnesses testified to the incident: Dooms, the victim, and defendant. While Dooms and the victim gave testimony of acts by defendant comprising all the elements of sexual abuse, the jury could reject part of their testimony, and the burden of proof was on the State to establish all of those elements. *State v. Millspaugh,* 257 N.W.2d 513, 516 (Iowa 1977). In that event the jury could factually find one of the assaults. Moreover, defendant denied any sex act on the part of him or Dooms, but the jury could have disbelieved the sexual contact part of the testimony of Dooms and the victim even if defendant had not testified.

■ The three assault crimes are not all the same, however, as to the factual test. All three witnesses *including defendant himself* testified that defendant stabbed the victim with a knife. Nowhere in the record is any justification or excuse offered for the attack. A defendant may, by his own unexplained and uncontradicted testimony, ele-

vate a State's allegation to a verity. *State v. Shepard*, 247 Iowa 258, 266–67, 73 N.W.2d 69, 74 (1955) (overruled on another point by *State v. Jensen*, 189 N.W.2d 919, 923–24 (Iowa 1971)). *Shepard* applies here as to defendant's request for submission of simple assault; a factual basis does not exist for submission of that crime under this record. *State v. Hoel*, 238 Iowa 130, 131–32, 25 N.W.2d 853, 854 (1947). The trial court should have submitted the other two types of assaults as included offenses; the *legal* and *factual* tests were met.

The State points out, correctly, that the trial court submitted second- and third-degree sexual abuse in addition to first degree and that the jury rejected those included offenses and found defendant guilty of first degree. Hence, the State urges, defendant suffered no harm by the failure of the court to submit the assault offenses. *See State v. Smith*, 215 Iowa 374, 380, 245 N.W. 309, 311 (1932).

█ The rule of the cited case has its proper place, but this is not such a place. The defense was that although defendant stabbed the victim, neither he nor Dooms had sexual contact with her. Hence the factual issue in the case was sexual contact. All of the three crimes submitted had that element. First-degree sexual abuse required violence, which defendant admitted; if the jury was to find sexual abuse at all it would naturally find first-degree. The problem is that the jury had but two alternatives: to find sexual abuse in some degree, all requiring sexual contact, or to acquit. It had no alternative of finding in accordance with the defense: assault without sexual contact. The no-harm exception urged by the State does not apply here; the general rule requiring submission of included offenses is applicable. Iowa R.Crim.P. 21(3).

█ IV. *Insanity.* Defendant contends that the issue of his insanity at the time of the incident should have been submitted to the jury. The question is whether the record raised the issue of insanity. That issue does not arise unless substantial evidence from some source appears in the record of the accused's incapacity to commit the crime under the M'Naghten rule. *State v. Thomas*, 219 N.W.2d 3, 5 (Iowa 1974); *see State v. Watts*, 244 N.W.2d 586, 589 (Iowa 1976); § 701.4, The Code.

Upon examination of this record, we agree with the trial court's analysis:

With respect to the first proposed instruction, No. 1, of the defendant concerning the issue of insanity, of course insanity was noticed by the State as a potential defense in this trial and the Court would be required to submit every issue upon which substantial evidence has been produced, whether it be by the State or by the defendant, concerning the issue of insanity. However, substantial evidence must be judged pursuant to the standard, that being the M'Naghten Rule, and the Court concludes that there is no substantial evidence in this case in this regard produced by any party pursuant to the M'Naghten Rule which raises in issue of the defendant's insanity at the time of the commission of the offense. Certainly, we had individuals state that the defendant was high, whatever that is, certainly we had people state that he had taken angel dust or whatever that is or is not or whatever affects that may be or not be, we had a defendant's intelligence; we have had the defendant testify, in essence, I guess, in the light most favorable to the defendant, that he did not remember those events which occurred subsequent to this stabbing.

There is no evidence in the record raising the issue of insanity pursuant to the M'Naghten Rule. No question was ever asked nor evidence elicited which would bear upon whether or not the defendant had sufficient mental capacity to know or understand the nature or quality of the acts charged or whether or not he had the mental capacity to distinguish between right and wrong as to the acts charged. There is a complete absence in the record of any evidence raising in issue pursuant to M'Naghten. To submit insanity to the Jury would be to allow them to speculate and base a decision on conjecture solely

and not have evidence in the record. I think the record is wholly deficient to raise the issue of insanity. The issue having been raised pursuant to the M'Naghten Rule, it would therefore be error for the Court to submit the same.

Evidence appears that defendant had used "angel dust" on the evening in question, but voluntary use of drugs, like voluntary alcoholic intoxication, does not constitute a defense to crime except where it prevents formation of requisite specific intent that did not previously exist. *State v. Hall*, 214 N.W.2d 205, 207–08 (Iowa 1974) (alcoholic intoxication may also be considered on whether alleged provocation was adequate). Substantial evidence does not appear in the record that defendant was unable to formulate specific intent for the included offenses. Sexual abuse itself does not require specific intent. *State v. York*, 293 N.W.2d 13, 14 (Iowa 1980).

We do not find merit in defendant's contention. On the record, insanity is not involved in the case.

V. *Ineffective assistance of counsel.* Defendant's appellate attorneys were not his trial attorneys. Defendant contends finally that he did not have trial counsel assistance which was "within the range of normal competency." *State v. Rand*, 268 N.W.2d 642, 648 (Iowa 1979). Since the case must be tried again, this issue is moot.

We return the case to district court for retrial.

REVERSED.

All justices concur except REYNOLDSON, C. J., and LeGRAND, McGIVERIN, and SCHULTZ, JJ., who concur in part and dissent in part.

LeGRAND, Justice (concurring in part and dissenting in part).

I concur in the result because under the rationale of *State v. Johnson*, 291 N.W.2d 6 (Iowa 1980), the trial court should have submitted as included offenses both assault while participating in a felony and aggravated assault.

However, I dissent from Division I dealing with the cross-examination of Darren Dooms, who participated with defendant in commission of the crime. Dooms was promised leniency in return for his testimony. He was to plead to an aggravated misdemeanor carrying a maximum two-year penalty. First-degree sexual abuse is punishable by a life sentence. The trial court restricted cross-examination in only one respect: counsel was not allowed to show the crime for which defendant was being tried carried a life sentence.

The extent of cross-examination lies largely within trial court's discretion. We reverse only when it is abused. While it might be argued defendant should have been permitted to show the penalty involved, I cannot agree refusal to do so was an abuse of discretion. I think the case is similar to *State v. Armento*, 256 N.W.2d 228, 230 (Iowa 1977), where we held there was non-prejudicial error in excluding evidence of the penalty for first-degree murder because it was "unrealistic to suggest the jury would not be aware that the penalty for first-degree murder is most severe." It is equally "unrealistic" to suppose the jury in the present case did not know the penalty for first-degree sexual abuse—forcible rape—was "most severe."

Another reason making reversal on this ground improper is counsel's failure to cross-examine Dooms on this point except in a most cursory manner. There was no real attempt to establish bias, although the defense was foreclosed on only one point— the penalty. In view of counsel's disinterest in pressing this subject, I believe it is error to permit him now to say defendant was deprived of a fair trial on that ground.

REYNOLDSON, C. J., and McGIVERIN and SCHULTZ, JJ., join this concurrence in part and dissent in part.