STATE of Iowa, Appellee,

v.

Marvin E. LUCAS, Appellant.

No. 83–701.

Supreme Court of Iowa.

May 22, 1985.

Rehearing Denied July 26, 1985.

Charles L. Harrington, Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Marcia Mason, Asst. Atty. Gen., and Alan Shirley, Co. Atty., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, LARSON, and CARTER, JJ.

REYNOLDSON, Chief Justice.

Defendant was convicted of second-degree murder and two counts of attempt to commit murder, violations of Iowa Code sections. 707.3 and 707.11. After the court of appeals reversed, we granted the State's application for further review. We now vacate the court of appeals decision and affirm the district court.

Defendant Marvin Lucas is a forty-eight year old father of two children. His most recent permanent residence was Baton Rouge, Louisiana.

Under the record in this case, the jury could have found the following facts. In the summer of 1981, following a marital dispute, Lucas moved out of the home and rented an apartment. Though prior to this time he had "probably twenty drinks in [his] life," Lucas began to make regular stops at taverns on his way home from work. At first his drinking was social. Gradually it became heavier. In March of 1982, Lucas was arrested on an OWI charge. During this same period, he experienced some alcohol-related blackouts.

In mid-May 1982, defendant lost all interest in his job. He quit, packed his car and left Baton Rouge. He testified he "really wasn't going any specific place" but "just more or less driving." He wandered aimlessly to Georgia, Illinois, south again to Florida, back through South Carolina, west to Missouri and then into Iowa.

July 10, 1982, Lucas arrived in Des Moines. He decided to drive to Denver to visit friends and see about a job with his former employer. West of Des Moines, he stopped at a rest area and sat there "watching people coming and going and thinking about everything" until about 5 p.m. Feeling hungry, he drove to Dexter, the nearest town.

Instead of going to a restaurant, Lucas entered a local tavern at about 6 p.m. While Lucas drank beer, he and the barmaid shot pool. For perhaps an hour, Lucas and the barmaid were the only people in the tavern. The barmaid testified that during the evening Lucas made a pass at her. Over the course of the next three or four hours Lucas drank six or seven bottles of beer and an undetermined number of mixed drinks. Most witnesses, however, testified he did not appear to be heavily intoxicated during the ensuing events.

By ten o'clock the bar had become crowded. Lucas had noticed the arrival of the barmaid's boyfriend, Jim Ludwick. Lucas put his pool cue away and sat at the bar drinking beers served by the barmaid. While he sat there, a cap popped off one of his teeth. After Lucas got down on all fours to search for it, a group of young men, including Jim Ludwick, began laughing at him. Words were exchanged.

There was testimony that one or two members of this group threw firecrackers in Lucas' vicinity while he was on the floor.

Lucas then sat at a table with a local attorney and his wife, telling them he wanted to get away from "these fellows at the counter." The attorney testified Lucas appeared to be in control of his faculties and conversed pleasantly. When the attorney's wife found the cap, Lucas thanked her and put it in his shirt pocket. About 10:35 p.m. the couple left.

Lucas then walked to the bar, said something to Ludwick, then moved his auto from the west to the east side of the street, nearer the tavern. He removed a pistol from under the car seat, placed it in his waistband and returned to the bar.

Once inside Lucas again took up the search for his cap, even though he already had found it. During this search, after he lay on the floor for about one minute, he got up and began to search again.

Lucas then walked over to Ludwick, pulled out the pistol, pointed it at Ludwick's head and said, "I should blow your head off." Ludwick responded, "Go ahead." Lucas then shot Ludwick in the head, causing his death. He also shot and wounded the two other men in the trio that had ridiculed him. The bar patrons subdued Lucas, punched and kicked him, inflicting serious head injuries.

Police officers arrived at the bar and handcuffed Lucas. They later testified he seemed disoriented, confused, not aware why he was handcuffed and anxious to get home. Lucas complained of the pain caused by his injuries. He accurately directed the police to the place in his car where he kept the ammunition for his gun.

Some events that occurred after the crime played an important role in the trial. Police investigation revealed that the barmaid had some illegal drugs, perhaps stimulants, in her purse on the evening of July 10. The purse was kept in a room behind the bar. These drugs were destroyed by local police officers soon after the crime, so their precise character is uncertain. A blood test of Lucas taken a few hours after his arrest showed his blood-alcohol level to be 161 milligrams percent. Through extrapolation, experts opined that Lucas' blood-alcohol level at the time of the shooting was 230 milligrams percent, enough to induce a semistuporous state, staggering, uncontrolled thinking, garbled speech and extreme drowsiness. No drug screening was done. Lucas testified he could remember nothing from the time he lost his cap until the police arrived.

Lucas was charged with three felony counts: first-degree murder and two counts of attempted murder. He gave notice of his intention to rely on the defense of temporary insanity by involuntary intoxication.

At trial, Lucas advanced the argument that the barmaid "slipped him a mickey." The district court refused to submit Lucas' temporary insanity instruction to the jury for two reasons: (1) Iowa Code section 701.5 forbade the use of temporary insanity as a complete defense, whether induced by voluntary or involuntary intoxication; and (2) the record was void of substantial evidence to support the instruction.

February 24, 1983, the jury found Lucas guilty of second-degree murder and two counts of attempted murder. March 16, he unsuccessfully moved for a new trial, citing as error the trial court's refusal to give the temporary insanity instruction. After Lucas was sentenced he filed timely notice of appeal.

We transferred the case to the court of appeals. That court reversed and remanded, holding that (1) temporary insanity by involuntary intoxication is a complete defense to a criminal charge, and (2) there was sufficient evidence of involuntary intoxication to warrant submission of a jury instruction on the temporary insanity defense.

On review this appeal presents two questions: (1) Did the district court err in ruling that Iowa Code section 701.5 prohibits the

use of temporary insanity due to involuntary intoxication as a complete defense to a criminal charge? (2) Did the district court err in finding that defendant's insanity defense was unsupported by substantial evidence and should not be submitted to the jury?

We will address these questions in reverse order.

■ I. An accused is entitled to have an insanity instruction submitted to the jury only when substantial evidence from some source appears in the record. *State v. Donelson*, 302 N.W.2d 125, 135 (Iowa 1981). Assuming for the purposes of this analysis that temporary insanity by involuntary intoxication is a complete defense in this state, it follows that Lucas was required to adduce substantial evidence on two issues in order to get the jury instruction: (1) his insanity, and (2) his involuntary ingestion of an intoxicant. *City of Minneapolis v. Altimus*, 306 Minn. 462, 467–68, 238 N.W.2d 851, 855 (1976). Only the second of these two is contested here.

Lucas' theory is that the barmaid, using the drugs in her purse, laced his drinks with a stimulant. This stimulant then counteracted the soporific effects of the alcohol in his body and induced a blackout and temporary insanity. Lucas concedes there is no direct evidence to support this theory.

■ The circumstantial evidence on which Lucas relies comes from various sources. We are required to consider this evidence in a light most favorable to Lucas. *State v. Tomlinson*, 243 N.W.2d 551, 553 (Iowa 1976). Expert testimony would have permitted the jury to find that, with the amount of alcohol in his system at the time of the shooting, Lucas should have been in a semistuporous state. His failure to so behave despite his blood-alcohol level was consistent with ingestion of stimulants. This expert also testified, however, that some people simply have a high tolerance for alcohol and could perform as Lucas performed despite a high blood-alcohol level. The expert further testified that people with a history of alcohol abuse also have a greater tolerance of alcohol. Lucas testified that he had experienced blackouts brought on by his alcohol abuse during the seven months prior to the shooting. Lucas' blackout the night of the shooting was entirely consistent with this history.

There was some evidence that Lucas did not cry out in pain when he was beaten by the crowd of bar patrons. The record supplies only fleeting support for the inference Lucas seeks to convey; i.e., that he could not feel pain in his drug-induced state. Several witnesses testified to the general confusion that ensued during the beating. A police officer testified that Lucas complained of his injuries.

Perhaps the strongest evidence offered by Lucas in support of the involuntary intoxication instruction is the presence of an illegal drug in the barmaid's purse. Yet this evidence, too, is insubstantial. There was no testimony that the barmaid or anyone else entered the storage room in which the purse was kept. There is no evidence in the record to show what motive the barmaid might have had to drug Lucas. Though Lucas argues correctly he is not required to show motive, he is required to present substantial evidence. Establishment of a motive for the barmaid's alleged drugging of Lucas' drink might have lent weight to what is otherwise a shadowy, spectral theory.

Lucas' inability to recall the evening's events points up the weakness of his argument. His cause might have been advanced had he been able to testify that he did not voluntarily take any drugs during the course of the evening. Having had an extraordinary amount of alcohol in his system at the time of the shooting, Lucas was unable to provide this crucial evidence.

■ Viewing the record in a light most favorable to Lucas, we find little more than a chain of wraithlike speculations, which

neither separately nor together constitute the substantial evidence necessary to warrant submission of the insanity instruction to the jury. *See State v. Mriglot*, 88 Wash.2d 573, 577–78, 564 P.2d 784, 786–87 (1977) (Defendant's testimony that "something was put in my beer" together with expert testimony in the form of answers to hypothetical questions, held insufficient to support involuntary intoxication instruction.).

II. The State agrees with Lucas that section 701.5 does not prohibit the use of temporary insanity by involuntary intoxication as a complete defense.[1] This court has never passed on this question and, given our disposition of the first issue, we have no need to consider it now. Though the State's application did not seek review of the court of appeals holding on this issue, in these circumstances we nonetheless may consider the advisability of permitting its disposition to stand. *See Shivvers v. Mueller*, 340 N.W.2d 586, 588 (Iowa 1983). Had that court reached the same determination of the first issue, it, too, would not have reached the second. Therefore, we vacate the court of appeals opinion on both issues presented on appeal from the district court.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.

---

1. Iowa Code section 701.5 provides:

    Intoxicants or drugs. The fact that a person is under the influence of intoxicants or drugs *neither excuses the person's act nor aggravates his or her guilt,* but may be shown where it is relevant in proving the person's specific intent or recklessness at the time of the person's alleged criminal act or in proving any element of the public offense with which the person is charged.

    (Emphasis added.)