# IN THE COURT OF APPEALS OF IOWA

No. 15-2188
Filed May 3, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**NICHOLAS JOHN LUERKENS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Mitchell E. Turner, Judge.

The defendant appeals his conviction of first-degree murder, claiming the jury should have been instructed to consider his defense of insanity.

**REVERSED AND REMANDED FOR NEW TRIAL.**

Webb L. Wassmer of Wassmer Law Office, PLC, Marion, for appellant.

Thomas J. Miller, Attorney General, and Aaron J. Rogers, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Nicholas Luerkens appeals his conviction following a jury trial on the charge of first-degree murder, in violation of Iowa Code section 707.2 (2015), in the stabbing death of Lynnsey Donald. Luerkens contends the district court erred in refusing to submit his insanity defense to the jury.[1] Because he did present sufficient evidence of his mental status and there was substantial evidence in the record to submit Luerkens's affirmative defense of insanity to the jury, we reverse and remand for a new trial.

**I. Background Facts and Proceedings.**

The facts as presented at trial demonstrate that Luerkens and Lynnsey were involved in a romantic relationship beginning in January 2014. Lynnsey and her son, A.D., moved in with Luerkens, but in December 2015, she moved out to live with a friend due to Luerkens's drinking issues. In February 2015, Luerkens went to a doctor for symptoms associated with depression. He obtained a prescription for Paxil. However, his alcohol consumption and mood worsened. He missed family events, and his relationships deteriorated. He continued to drink excessively. Luerkens eventually moved out of his mother and father's house. Luerkens also engaged in unwanted contact with Lynnsey. On several occasions, another party had to instruct him to leave her residence. A witness testified that on one occasion around March 2015, Luerkens had been drinking when he showed up to Lynnsey's residence uninvited. Lynnsey eventually blocked Luerkens's attempts to contact her through phone and text

---

[1] Luerkens also claims the district court abused its discretion in denying his for-cause challenges of two jurors. Because we find the insanity-defense claim dispositive, we do not consider this claim.

messages. Luerkens used other numbers to circumvent Lynney's attempts to block his communications.

On April 21, 2015, Luerkens sharpened an eight-inch kitchen knife before tracking down Lynnsey at the nearby Hy-Vee store in Marion, Iowa.[2] Luerkens parked his car next to Lynnsey's car while she was in the store with A.D. Shortly after, Luerkens moved his car behind an SUV while Lynnsey and A.D. exited the store. Luerkens then ran in between the parked vehicles and attacked Lynnsey with the knife. Witnesses testified Luerkens screamed, "I'm going to kill my wife," "You fucking bitch," and "She's dead now," during and after the stabbing. Witnesses also testified that Luerkens was making "really horrific animalistic sounds." The entire incident was captured by a nearby video camera.

A forensic patholgist testified Luerkens cut Lynnsey thirty-two times during the incident. Six incised wounds were present on Lynnsey's neck; the worst neck wounds cut through the main muscles of the front of the neck, the thyroid gland, and the trachea. Another grouping of stab wounds around the chest and abdomen penetrated into her left lung between three and four inches deep and injured multiple major organs. Lynnsey also suffered defensive wounds on her right and left hands. Lynnsey succumbed to her stab wounds at the scene within minutes of the attack.

Before the police arrived, Luerkens attempted to stab himself in the chest and abdomen. Witnesses testified that the knife was bent from stabbing Lynnsey, and Luerkens attempted to straighten the blade on the concrete before

---

[2] It is unclear from the record how Luerkens knew Lynnsey would be at the Marion Hy-Vee store.

he attempted to stab himself. He also shouted, "I want to die," "I need to kill myself," and "I don't want to go to jail" at the scene. When the police asked him about going to the hospital to treat his wounds, he responded, "I don't need an ambulance, man. You're going to take me to jail anyways," and "My fucking life is over now." He also attempted to reopen his wounds by reaching and grabbing at them. At the hospital, Luerkens underwent surgery to repair his stab wounds. On May 8, 2015, Luerkens was charged by trial information with first-degree murder.

Luerkens filed a notice of defense of insanity pursuant to Iowa Rule of Criminal Procedure 2.11(11)(b).[3] At trial, much of the focus was on Luerkens's mental state before, during, and after the stabbing. Lay witnesses testified regarding Luerkens's mental condition prior to the stabbing. Debra Luerkens, the defendant's mother, opined that her son's mental condition declined soon after he started taking Paxil.[4] She stated, "I do believe that there's a reason he wouldn't know it's right or wrong, and its Paxil." She cited instances of Luerkens being sick, throwing up, and waking up with nightmares to support her opinion. Cameron Luerkens, the defendant's father, also testified regarding the defendant's condition. He stated, "I'm saying absolutely that it came to a point in time where I think he became amoral. He lost his way. He didn't know right from wrong. And [it] came to the point of when the event happened he absolutely did not know right from wrong. He did not think about any consequences."

---

[3] Luerkens also filed a notice of defense of diminished responsibility and/or intoxication. These defenses are not a part of this appeal.

[4] This was not the first time Luerkens had used Paxil. Luerkens told his own expert witness that he had used Paxil on a separate occasion in the past.

Other witnesses testified Luerkens was distant, deteriorating, and acting abnormal prior to the stabbing. For example, his brother testified Luerkens's demeanor alarmed him in the days leading up to the stabbing and "maybe he had some deeper chemical depression imbalances in his brain that were going on that were causing some of that type of behavior." A mental health worker, who was also a family friend, testified he recommended Luerkens should be committed based on his alarming behavior. Specifically, "The statements that were being said to me were very concerning of what Nick was doing or not doing. Nick was spiraling downward. So I felt that—in my experience that Nick needed help, and the only way . . . for Nick to get help is committal."

Luerkens's mother also testified that approximately three days after the stabbing Luerkens told her, "something bad happened." Luerkens's father testified that sometime after the stabbing at the hospital "[Luerkens] told me he did something wrong that he probably should not have done." Medical professionals who encountered Luerkens after the stabbing also testified about his condition. A jail nurse explained Luerkens was on suicide watch while at the Linn County Jail "[b]ecause of the nature of [his] crime, the impulsivity of his actions, and also because he had harmed himself."

After reviewing the records and examining Luerkens, the defense expert testified that, at the time of the crime, Luerkens was suffering from major depressive disorder, or clinical depression, a diagnosis that is present in approximately seven percent of the population. The expert testified major depressive disorder "can affect [a person] in that they're not thinking as they did before. All their thoughts are going to be very, very negative about the present

time and future." The expert stated Luerkens "doesn't have a significant recollection of the crime itself" and the nature of the crime suggested Luerkens "was not in control." Luerkens also suffered from severe alcohol use disorder, which is supported by toxicology reports that show cocaine, amphetamine, methamphetamine, alcohol, THC, and methorphan in Luerkens system at the time of the stabbing.

The State called various witnesses to testify regarding Luerkens actions and mental state. The responding officer who stayed with Luerkens at the scene and hospital testified Luerkens repeatedly stated he wanted to die and he did not want to go to jail forever. Video evidence of the scene also supports the officer's testimony. The officer also stated Luerkens appeared to be lucid and coherent during the times the officer spoke with him at the scene and at the hospital.

The record reveals that during the investigation, police found a knife sharpener on Luerkens's living room table. Luerkens's journal was also discovered, in which he wrote: "Fuck Life! Lynnsey Will Die," "To Do: Plot to track down and kill Lynnsey and maybe [A.D.]," and "Fuck Life Lynnsey Dies!"

At the close of the evidence, Luerkens submitted a proposed jury instruction to the court regarding the issue of his insanity defense. The State resisted. In its ruling, the court made the following determination on the proposed instruction and the submission of the defense to the jury:

> My recollection of the testimony was that there was really not even a scintilla of evidence presented from [Luerkens] pertaining to the Defendant's inability to know the difference between right and wrong or the Defendant's inability to appreciate the nature or the consequences of his actions. In addition, I believe that the expert witness testified that, while Mr. Luerkens carries with him a DSM-5 diagnosis of major depressive disorder, he also testified that I think

between seven and ten percent of the population at any single time could carry with it a diagnosis of a major depressive disorder. That does not mean that every one of those people are insane.

Based on the record as made, I'm afraid that I don't believe that you've submitted sufficient evidence to submit the insanity defense to the jury at this time, and the submission of such a defense would only serve to confuse the jury in that there is no evidence to support it in this record.

Following deliberations, the jury returned a guilty verdict of murder in the first degree. Luerkens now appeals.

**II. Standard of Review.**

We review a challenge to the district court's refusal to submit a jury instruction for correction of errors at law. *See State v. Hartsfield*, 681 N.W.2d 626, 630 (Iowa 2004).

**III. Discussion.**

Luerkens argues the district court erred in refusing to submit his insanity defense to the jury because the record contains sufficient evidence, viewed in the light most favorable to Luerkens, to submit the issue to the jury. He claims evidence showing he was incapable of distinguishing right from wrong presented a fact question on his sanity. Luerkens further argues testimony from witnesses describing his declining mental state supports testimony that he was incapable of distinguishing right from wrong. The State argues the district court properly denied Luerkens request to instruct the jury on an insanity defense because he failed to present substantial evidence at trial for a reasonable jury to conclude he was legally insane under Iowa law. We disagree.

Iowa courts follow the *M'Naghten* test when evaluating an insanity defense. *See State v. Lass*, 228 N.W.2d 758, 768 (Iowa 1975). Under the *M'Naghten* test, a defendant is not liable if

> "at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong."

*State v. Harkness*, 160 N.W.2d 324, 329 (Iowa 1968) (citation omitted). In 1976, the Iowa legislature codified the *M'Naghten* rule, and it now reads as follows:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or was incapable of distinguishing between right and wrong in relation to that act.

Iowa Code § 701.4. A criminal defendant is presumed sane, and it is the defendant's burden to establish insanity under section 701.4. *State v. Arthur*, 160 N.W.2d 470, 473 (Iowa 1968) ("The law presumes all men sane until the contrary is established by competent evidence to the satisfaction of the jury.").

Generally, the court must instruct the jury on all material issues raised by the evidence. *State v. Broughton*, 425 N.W.2d 48, 51 (Iowa 1988). To warrant submission of a defense to the jury, however, the defendant must produce substantial evidence *from any source* to support the theory. *Id.*; *State v. Lucas*, 368 N.W.2d 124, 127 (Iowa 1985). "If there is such substantial evidence, the district court has a duty to give a requested instruction on the defense." *State v. Dunson*, 433 N.W.2d 676, 677 (Iowa 1988). "An accused is entitled to have an insanity instruction submitted to the jury only when substantial evidence from some source appears in the record." *Lucas*, 368 N.W.2d at 127. "Substantial

evidence is that which a reasonable person would find adequate to reach a conclusion." *Greenwood v. Mitchell*, 621 N.W.2d 200, 204 (Iowa 2001); *see also State v. Booth*, 169 N.W.2d 869, 871 (Iowa 1969) ("Defendant's alleged insanity may be submitted to the jury only if there is evidence upon which the jury could find he was insane under the *M'Naghten* rule at the time the act was committed."); *State v. Hodge*, 105 N.W.2d 613, 622 (Iowa 1960) ("[W]here there is substantial evidence of insanity at the time of the commission of the offense charged, the question should be submitted to the jury under proper instructions."). When determining whether the evidence is substantial, we give the evidence "the most favorable construction possible in favor of the party urging submission." *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 108 (Iowa 1986). "Like all affirmative defenses, insanity is a question of fact and should not be submitted unless the evidence would sustain an affirmative finding on that issue." *Booth*, 169 N.W.2d at 871.

We note the distinction between the requisite amount of evidence to determine whether a trial court should submit an affirmative defense to the jury and the amount of evidence necessary to prove the defense. *Compare Hodge*, 105 N.W.2d at 622 ("[W]here there is substantial evidence of insanity at the time of the commission of the offense charged, the question should be submitted to the jury under proper instructions."), *with* Iowa Code § 701.4 ("[T]he defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in

relation to the act."). Accordingly, the trial court must first ascertain whether there is enough evidence to submit the instruction on the defense of insanity to the jury for its consideration. Next, the jury must determine whether Luerkens proved his insanity defense by a preponderance of the evidence.

After reviewing the record in the light most favorable to Luerkens, we find the trial court erroneously denied Luerkens's request for an insanity instruction. Luerkens submitted substantial evidence from which a reasonable jury could conclude that "at the time the crime [was] committed [Luerkens] suffered from such a diseased or deranged condition of the mind as to render [Luerkens] incapable of knowing the nature and quality of the act . . . [or] distinguishing between right and wrong in relation to that act." *See* Iowa Code § 701.4. The record contained evidence that demonstrated Luerkens was unable to understand the nature and quality of his act or distinguish between right and wrong in relation to the act.

Generally, testimony regarding the defendant's deteriorating mental condition combined with related testimony regarding the defendant's actions surrounding the crime is sufficient to submit an insanity defense to the jury. *See e.g.*, *State v. Hamann*, 285 N.W.2d 180, 181, 185 (Iowa 1979) (finding expert testimony explaining defendant's delusions impaired his ability to determine right from wrong combined with testimony about the defendant's non-aggressive nature is sufficient to submit insanity defense to the jury); *Lass*, 228 N.W.2d at 762 (finding substantial evidence exists in the record to submit insanity defense to the jury where the defendant's action surrounding the crime, conflicting

psychological experts, and lay witnesses testified as to the defendant's conduct bearing on sanity); *State v. Hodge*, 105 N.W.2d 613, 623 (Iowa 1960).

In *Hamann*, for example, the defendant's insanity defense proceeded to the jury after he was tried for shooting and killing an individual on a delusion that the defendant's "father's life was endangered by a malicious adversary," according to expert testimony. 285 N.W.3d at 181. The State presented contradictory expert testimony that the defendant's belief about his father's adversary was not a delusion but an opinion. Lay witnesses testified that the defendant was "gentle and nonaggressive." *Id.* at 182. While the jury convicted the defendant of first-degree murder, substantial evidence existed in the record for the trial court to submit the insanity defense to the jury.

Similarly, in *Lass*, the defendant bludgeoned his wife to death with a brick, drove her body to a person's home, and fabricated a story about two men who hit his wife in the head with a pipe. 228 N.W.2d at 760–761. A witness testified the defendant was crying and appeared confused and shook-up after the murder. *Id.* at 761. The defendant testified he barely remembered the events but he assumed he had killed his wife. *Id.* at 762. Two expert witnesses gave conflicting testimony regarding the defendant's sanity. *Id.* The record in *Lass* was sufficient to submit the defendant's insanity to defense to the jury.

Here, during oral arguments to this court, the State argued *Hodge* supports a finding that the evidence was insufficient to submit the insanity defense to the jury. 105 N.W.2d 613, 622 (Iowa 1960). In *Hodge*,[5] evidence

---

[5] The underlying issue before the *Hodge* court regarding the defendant's insanity defense was whether the district court erred in its wording of the instruction. 105 N.W.2d

presented at trial included a confession by the defendant where he admitted to striking the victim with a lead pipe, which was found at the scene, and stealing his billfold. Additional evidence included testimony from the defendant's wife that the defendant "had a strange look like somebody that is drunk has in his eyes[,]" and about two and one-half years before the charged incident, the defendant had stopped talking and started choking his wife with a "starey" look in his eye. *Id.* at 622–23. The mother of the defendant in *Hodge* also testified that after the murder, "he seemed more like a crazy person . . . I noticed he was skinny, but he said he was fat." *Id.* at 623. Another witness who knew the defendant at the time testified about an encounter shortly before the murder:

> He had a glassy, starey look. He sat in the corner and was just more or less in a blank state of mind. Normally he would carry on a conversation, but that day he sat there and didn't say three words the whole afternoon. . . . [He] did not act right and sat there in a daze.

*Id.* The court stated the above information, standing alone, "would make a close question on submission." *Id.* at 623. However, the defendant's sworn confession along with his own testimony undercut his defense. The court held the defendant was not entitled to a jury instruction explaining:

> We have gone into considerable detail with the defendant's own testimony because it seems to make it clear beyond question that he knew what he was doing at all times before, during, and after the altercation with [the victim]; except that he had a 'blackout' an hour or so before. This, however, was only momentary, and had long passed away before the trouble arose. The story told by the defendant from the witness stand is materially different from the manner of the occurrence as related in his confession, which makes the killing of [the victim] a cold-blooded assault with an iron pipe for the purpose of robbery as [the victim] was walking ahead of

---

613, 621–625 (Iowa 1960). In order to reach its conclusion, however, the court analyzed whether the evidence presented warranted the issuance of an instruction. *Id.* at 625.

him in the greenhouse; and the wounds on [the victim's] head strongly bear out the confession account. But we are not concerned with the manner of the killing at this point. Often the accused in this class of cases, where insanity is relied upon as a defense, claims that he does not remember the occurrence; that 'everything went black'. Not so here; *there is no word in the defendant's testimony to indicate he did not know at all times what he was doing and why*. If his witness stand version is to be believed, he was incensed because [the victim] made a slighting reference to defendant's wife, and assaulted him because of it. He knew every detail of the fighting and what he did immediately after. It is true he said that immediately after he had knocked [the victim] out he felt dizzy and like a drunk person and had an upset stomach. This, however, does not show insanity. It might well be only the normal reaction of a person to a hard fistic encounter.

*Id.* at 624–25.

Our precedent demonstrates evidence on the issue of insanity should be submitted to the jury when testimony of the defendant's deteriorating mental state, inability to tell right from wrong, peculiar behavior, and actions surrounding the crime support the claim the defendant "suffered from such a diseased or deranged condition of the mind as to render them incapable of knowing the nature and quality of the act . . . [or] distinguishing between right and wrong in relation to that act." Iowa Code § 701.4. However, an instruction should not be submitted when the defendant's own statements make the defense of insanity frivolous.

Here, Luerkens did not testify or confess, and he presented testimony from lay and expert witnesses supporting his deteriorating mental condition, including changes of personality and behavior indicating an inability to distinguish right from wrong or understand the nature of his acts. He attempted suicide following his frenzied stabbing of Lynnsey. His mother testified, "I do believe that there's a reason [Luerkens] wouldn't know it[']s right or wrong, and its Paxil." The

day before the murder, his mother received abnormal text messages from Luerkens stating, "I hate you and I hate Cam. I hope you rot in hell." His father also testified, "I'm saying absolutely that it came to a point in time where I think he became amoral . . . . He didn't know right from wrong." Testimony from the defendant's mother also suggests that prior to the stabbing, Luerkens "always knew the difference between right and wrong" and "[s]omething snapped, and the depression was so deep he felt he had to end something, and I think it was on a very irrational basis." His father also described an abnormal encounter with his son the day before the stabbing:

> I went over at Nick's house at noon, and Nick has an apartment window . . . on the first floor . . . [a]nd I couldn't get through the service door to get to the rest of the apartments. There's a door that's locked. You have to have a badge or key to get in. I did not have that.
>
> So Nick's window was one on the right of the sidewalk, so I knocked on it, said, "Nick, you know, let me in." He said, "Get out of here," or something like that. And [I said], "No, come here, let me in." And then Nick comes—I could hear him taking a shower. So he came out of the shower dripping wet with no clothes on, standing right in front of the window talking to me wanting me to get out of there, and that was very atypical of Nick because Nick was very private in what he wore and would always react very sheepishly if somebody would see him stark naked. So here he's coming out, not even worried about who's seeing him, water is dripping all over the place and just yelling at me, "Get out of here, I don't need you anymore." So that was the day before.

Furthermore, his mother testified Luerkens was not eating or sleeping, and he "started having nightmares, screaming in the middle of the night, waking up. He was throwing up. He was sick. At times he told me he couldn't breathe. He couldn't think."

Jeremy Luerkens, his brother, described the defendant's abnormal demeanor in the days leading up to the stabbing:

> I would maybe classify it as a wild stare. His eyes were bulging out of his head. . . . [I]t was not any kind of expression that I've seen from him in the past. . . . I was alarmed that there might be something deeper going on than maybe just some sadness about getting laid off or something, his relationship, that maybe he had some deeper chemical depression imbalances in his brain that were going on that were causing some of that type of behavior.

Jeremy further noted it was "a little bit scary."

A mental health worker and family friend who has known Luerkens throughout his life testified that before the stabbing, he recommended Luerkens should be committed to a mental health facility. He stated, "The statements that were being said to me were very concerning of what Nick was doing or not doing. Nick was spiraling downward. So I felt that—in my experience that Nick needed help, and the only way . . . for Nick to get help is committal." A jail nurse also testified that Luerkens was on suicide watch "because of the nature of [Luerkens's] crime, the impulsivity of his actions, and also because he had harmed himself." A medical expert conducted a psychological exam on behalf of Luerkens and concluded he was suffering from major depressive disorder, which "can affect [a person] in that they're not thinking as they did before. All their thoughts are going to be very, very negative about the present time and future." Luerkens's medical expert also testified that individuals taking Paxil can experience side effects such as "agitation and some more severe ones such as suicidal ideation[,] which has also led to individuals committing suicide because they were on the medication, as well as violent behavior." The expert opined that based on the nature of the crime, "[I]t wasn't really planned out and he did not seem to focus on that, because of the way it happened, where it happened. It

was not the trying to get away with something, so that could show evidence that he was not in control."

The defense also presented evidence regarding the nature of the crime to support the issue of insanity, as in *Lass.  See* 228 N.W.2d at 760–62.  The crime occurred in a public parking lot in the afternoon.  Witnesses testified Luerkens was making "horrific animalistic sounds" during the stabbing, "[h]e was grunting, moaning."  Another witness who approached Luerkens during the stabbing said, "I tried to push him to stop.  And when that didn't even faze him, I got behind him and went to pull him off of her, and that's when he stopped and looked at me[,] and I stopped and ran back to my car."  Witnesses also testified Luerkens stabbed himself in the abdomen and chest, and he tried to reopen his wounds after he was subdued.  Luerkens's suicidal efforts further support his desperate mental state.  *See State v. Kehoe*, 804 N.W.2d 302, 304–05 (Iowa Ct. App. 2011) (affirming conviction where the defendant's suicide attempt after murdering her children, along with expert testimony regarding the defendant's major depressive disorder, amounted to substantial evidence to submit an insanity defense to the jury).

Viewing the record in the light most favorable to Luerkens, a jury could conclude Luerkens was legally insane.  The evidence connecting his deteriorating mental state to his actions is sufficient to submit an insanity defense to the jury.  This is not a case where Luerkens is relying exclusively on his inability to remember the events, a depression diagnosis, or the level of drugs and alcohol in his system.  *See, e.g.*, *Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008) (holding an insanity defense based on depression alone is

unreasonable); *State v. Donelson*, 302 N.W.2d 125, 135-36 (Iowa 1981) (holding defendant's inability to remember the stabbing not substantial evidence of insanity); *State v. Hall*, 214 N.W.2d 205, 207 (Iowa 1974) (holding voluntary intoxication does not constitute a complete defense). Rather, Luerkens relies on eyewitness accounts, expert testimony, lay witness testimony, and other evidence demonstrating the connection between Luerkens's mental deterioration and his inability to distinguish right from wrong or the nature of his acts at the time of the stabbing. The evidence calls into question whether Luerkens suffered from "a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act." Iowa Code § 701.4.

We acknowledge the State submitted evidence to rebut the defendant's case, such as statements from the defendant acknowledging his legal situation. However, the question before us is not whether Luerkens was criminally insane but whether, after viewing the evidence in a light favorable to the defendant, substantial evidence exists in the record to present the insanity defense to the jury. The district court erred in denying the defendant's request to submit an insanity defense instruction to the jury. We reverse and remand for a new trial.

**REVERSED AND REMANDED FOR NEW TRIAL.**